**Glenn S. McDONALD and Roscoe Pondexter, Plaintiffs,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and California State University Long Beach, Defendants.**

**No. CV 74–87–LTL.***

United States District Court,
C. D. California.

Feb. 11, 1974.

* By Honorable Manuel L. Real, United States District Judge, designated to hear the matter because of the absence of Honorable Lawrence T. Lydick from the Court due to illness.

Harry J. Simon, Simon, McKinsey & Miller, Long Beach, Cal., for plaintiffs.

Richard J. Archer, Kristina M. Hanson, Thomas J. Mellon, Jr., Sullivan, Jones & Archer, San Francisco, Cal., George H. Gangwere, Swanson, Midgley, Eager, Gangwere & Thurlo, Kansas City, Mo., for National Collegiate Athletic Assn.

Evelle J. Younger, Atty. Gen., Edward M. Belasco, Deputy Atty. Gen., Los Angeles, Cal., for California State University Long Beach.

## MEMORANDUM OPINION AND ORDER

REAL, District Judge.

Plaintiffs Glenn S. McDonald and Roscoe Pondexter are basketball players who have during the 1973–74 academic year been competing in basketball on behalf of defendant California State University Long Beach (hereafter Long Beach.)

On January 8, 1974 McDonald and Pondexter were notified by Frank Bowman, University Athletic Representative at Long Beach, as follows:

". . . I have no alternative but to declare you ineligible for further participation in intercollegiate athletics."

This declaration of ineligibility of McDonald and Pondexter on behalf of Long Beach arises out of its membership in the National Collegiate Athletic Association (hereafter NCAA) and further out of a decision of that association imposing sanctions on Long Beach for the violation of its rules, which sanctions include, but are not limited to, Long Beach's declaration of ineligibility of McDonald and Pondexter.

McDonald and Pondexter have filed their Complaint For Injunction and Declaratory Relief alleging: (1) the unconstitutionality of NCAA Bylaw 4–6–B–1, commonly known as the 1.600 Rule, and (2) the violation of due process guaranteed by the Fourteenth Amendment to the United States Constitution, in light of the NCAA's failure to afford them notice and hearing on the claimed violations.

McDonald and Pondexter are now before the Court on their Order To Show Cause Re Preliminary Injunction, requesting the Court to enjoin the defendants NCAA and Long Beach from employing the 1.600 Rule and further from declaring them ineligible without a full and fair hearing on the charged violations of NCAA rules.

The parties concede that McDonald and Pondexter have not been afforded any hearing before any committee or

council of the NCAA, nor by Long Beach, pursuant to Long Beach's own student disciplinary procedures.[1] This concession limits the issue before the Court to the determination of whether the activities of NCAA and/or Long Beach amount to "state action," thereby invoking the entire panoply of constitutional limitations imposed by the due process clause of the Fourteenth Amendment.

Long Beach is a publicly owned, accredited University of the State of California and part of the State of California's university system. As such, little need be said about the actions of Long Beach except that they involve state action. The failure of Long Beach to invoke its own student disciplinary process is violative of due process, thereby making it subject to the injunctive relief sought by McDonald and Pondexter.

The NCAA is a voluntary, unincorporation, however, requires somewhat different considerations.

Declaring NCAA action to be state acrated association of approximately 769 members, consisting of colleges and universities, conferences and associations, and other educational institutions. Its active membership is comprised approximately equally of privately endowed and state financed and controlled four year colleges and universities.

The purpose of the NCAA is found in Article Two of the NCAA Constitution and Interpretations of The National Collegiate Athletic Association.[2] Central to all of its purposes is the NCAA's dedication to the maintenance of ath-

---

1. Chancellor's Executive Order 148. It provides for investigation, hearing before a hearing officer, confrontation and cross-examination of witnesses and findings. These findings are submitted to the President of the University for his decision with appeal to the Chancellor of The California State University and Colleges provided.

2. Constitution and Interpretations of The National Collegiate Athletic Association
ARTICLE ONE
\*      \*      \*      \*      \*
ARTICLE TWO
PURPOSES AND FUNDAMENTAL POLICY
Section 1. Purposes. The purposes of this Association are:
(a) To initiate, stimulate and improve intercollegiate athletic programs for student-athletes and promote and develop educational leadership, physical fitness, sports participation as a recreational pursuit and athletic excellence.
(b) To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the Constitution and Bylaws of this Association.
(c) To encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism.
(d) To formulate, copyright and publish rules of play governing intercollegiate sports.
(e) To preserve intercollegiate athletic records.

(f) To supervise the conduct of, and to establish eligibility standards for, regional and national athletic events under the auspices of this Association.
(g) To cooperate with other amateur athletic organizations in promoting and conducting national and international athletic events.
(h) To legislate, through Bylaws or by resolution of a Convention, upon any subject of general concern to the members in the administration of intercollegiate athletics.
(i) To study in general all phases of competitive intercollegiate athletics and establish standards whereby the colleges and universities of the United States can maintain their athletic activities on a high level.
Section 2. Fundamental Policy. (a) The competitive athletic programs of the colleges are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between college athletics and professional sports.
(b) Legislation governing the conduct of intercollegiate athletic programs of member institutions shall apply to basic athletic issues such as admissions, financial aid, eligibility and recruiting; member institutions shall be obligated to apply and enforce this legislation, and the enforcement program of the Association shall be applied to an institution when it fails to fulfill this obligation.

letics as an integral part of the educational programs of its members.

The purposes of the NCAA are accomplished by the promulgation of rules and regulations established at annual conventions with each member exercising its right to vote upon the proposed rules and regulations for the conduct of the association's membership. These rules and regulations are executed by a Council of eighteen members elected by the membership at the annual Convention of the NCAA.

Enforcement of the rules and regulations and supervision of the investigation of complaints of violations are entrusted to a five member Committee On Infractions, created under the Official Procedure Governing The NCAA Enforcement Program.[3] It is pursuant to this Procedure that the disciplinary measures—which precipitate this litigation to this Court—were imposed upon Long Beach and consequently upon McDonald and Pondexter.

The Official Procedure Governing The NCAA Enforcement Program provides for a hearing at which the member institution may present evidence. It also provides for a written report, including findings, to be submitted by the Committee to the Council with the right of appeal to the Council.

Presumably these procedures were followed in the instant case. (We say "presumably" since no complaint has been forthcoming from Long Beach to the effect that it was not afforded a hearing and since the affidavit of Warren S. Brown, Assistant Executive Director of the NCAA, clearly indicates that it was.)

Other violations found by the Council and the Committee on Infractions— which, though not strictly relevant here, do pertain to McDonald and Pondexter— are summarized as follows: [4]

"25. NCAA Bylaw 4–6–(b)–(1)—(i) A student-athlete was permitted to practice and participate in in-tercollegiate basketball as well as receive athletically-related financial assistance while ineligible under the prediction requirements of the NCAA 1.600 rule; (ii) an assistant basketball coach arranged for two prospective student-athletes to be credited with fraudulent test scores which were erroneously utilized by the University to certify both young men eligible for practice, participation and athletically-related financial assistance under the prediction requirements of the NCAA 1.600 rule; (iii) a student-athlete practiced, participated in intercollegiate basketball competition and received athletically-related financial assistance while ineligible for such benefits under the prediction requirements of the NCAA 1.600 rule on the basis of a fraudulent test score credited to him; (iv) an assistant basketball coach arranged for a prospective student-athlete to be credited with a fraudulent test score which was actually utilized by the University to establish the young man's eligibility for athletically-related financial aid, practice and participation."

Although not naming McDonald and Pondexter, it is this infraction which resulted in their declaration of ineligibility by Long Beach.[5]

The penalties imposed as a result of this and other enumerated infractions— 26 in number—are directed against Long Beach and not personally against McDonald or Pondexter. Among the penalties levelled against Long Beach by the NCAA were the imposition of a term of probation and a prohibition from Long Beach's participation in NCAA-sponsored, post-season championship

3. See Appendix A.

4. NCAA Press Release dated January 6, 1974.

5. Long Beach was notified in specific language naming McDonald and Pondexter.

competition. Long Beach was further barred from appearing on NCAA-sponsored television programs for the period of its probation.

Specific findings upon the violations claimed as summarized above, but specifically naming McDonald and Pondexter, were received by Long Beach. Thus, Long Beach's declaration of ineligibility of McDonald and Pondexter is claimed to have been compelled by Section 9 of the Official Procedure Governing The NCAA Enforcement Program providing for an order to show cause why an institution, failing to take appropriate action, should not be disciplined for its failure.

"Appropriate action" is found in the Constitution and Interpretation Of The National Collegiate Athletic Association, Article Three, Section 9 providing:

"Section 9. Principles Governing the Eligibility of Student-Athletes. An institution shall not permit a student-athlete to represent it in intercollegiate athletic competition unless he meets the following requirements of eligibility:

\* \* . \* \* \* \*

(e) He shall be denied eligibility for intercollegiate competition in all sports if (1) he has knowingly and willfully violated Constitution 3–4; (2) he has been guilty of fraudulence in connection with an entrance or placement examination, . . .."

It is this compulsion that is now claimed by McDonald and Pondexter—joined in by Long Beach—which entitles them to the relief they seek from the NCAA. Their argument must be supported by a finding that NCAA action is—(1) state action as required to sustain a claim arising under 42 U.S.C. § 1983; [6] and (2) is violative of the guar-

antees of Fourteenth Amendment due process.

"State action" has had a somewhat tortured and uncertain reception in the courts. The Supreme Court of the United States met the problem in Burton v. Wilmington Parking Authority, 365 U. S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1960). In *Burton, supra,* the State of Delaware, through its established Wilmington Parking Authority, built a parking facility to accommodate public parking. As part of the structure, the authority leased space for the establishment of the Eagle Coffee Shoppe. Burton, a negro, attempted to obtain service in the coffee shop and was refused. In answer to the argument that the coffee shop was a private establishment and not subject to equal protection mandates of the Fourteenth Amendment, the court found that:

". . . [T]he State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." Id. at 725, 81 S.Ct. at 862.

Finding state action in *Burton, supra,* presented little difficulty since the fact that Eagle derived its very existence from a state lease can readily be seen to make of it a "sovereign equivalent." [7] But, Justice Clark, in speaking for the Court, does sound the warning that:

". . . [O]wing to the very 'largeness' of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the

6. 42 U.S.C. § 1983. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

7. "Sovereign equivalent" as used herein is applicable to an otherwise private entity exercising some form of action derived from its relationship—expressly or impliedly—from some sovereign entity, i. e., state, etc.

framework of the peculiar facts or circumstances present. Therefore respondents' prophecy of nigh universal application of a constitutional precept so peculiarly dependent for its invocation upon appropriate facts fails to take into account 'Differences in circumstances [which] beget appropriate differences in law.'" Id. at 726, 81 S.Ct. at 862.

The warning was again sounded by the Supreme Court in Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) where Justice Douglas, speaking for the Court, notes:

". . . [T]he range of governmental activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions." Id. at 300, 86 S.Ct. at 489; See also, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

■ The conclusion to be drawn from the Supreme Court's consideration of ostensibly private action as state action requires more than an analysis of what an organization does, i. e., its functions. What must appear is that the state must be so inextricably involved in the "private" action or must be able to so control the "private" action that this activity necessarily becomes the functional equivalent of an act of the sovereign.

Claims similar to those of McDonald and Pondexter have been made against the NCAA, with the result that the actions of the NCAA have been considered to be state action, thereby bringing its procedures within the safeguards secured by the due process guarantees of the Fourteenth Amendment. Parish v. NCAA, 361 F.Supp. 1214 (W.D.La. 1973); Isaac Curtis, et al. v. NCAA, Civil No. C–71–2088 ACW (N.D.Cal. 1972); Associated Students, Inc. of California State University—Sacramento et al. v. NCAA, Civil No. F2754 (E.D. Cal.1973).

In Parish v. NCAA, 361 F.Supp. 1214 (W.D.La.1973), Judge Dawkins reviews the activities by which the NCAA subjects state agencies—as Long Beach in this case—to its regulations and discipline. He then quantitatively concludes that, since approximately half of the membership of the NCAA is comprised of state institutions, the NCAA must be involved in state action. Moreover, Parish, supra, relies heavily on Louisiana High School Athletic Association v. St. Augustine High School, 396 F.2d 224 (5th Cir. 1968), in its determination of state action. The considerations involved in St. Augustine, supra, however, are really inapposite to those which relate to the activities of the NCAA.

In St. Augustine, supra, the Court of Appeals was concerned with a racially discriminatory interscholastic high school athletic program, exclusively supervised by the Louisiana High School Athletic Association. In finding state action, the Court enumerates the great control the association exercises over interscholastic athletics and concludes that:

"The factual context is not of the state's declining to act in an area which is then taken over by a private instrumentality. The state has not withdrawn from supervision and coordination of interscholastic activities as the Association contends. Instead, as the district court pointed out, interscholastic athletics is a program in which the state is actively and intensively involved, and 'for the state to devote so much time, energy, and other resources to interscholastic athletics and then to refer coordination of those activities to a separate body cannot obscure the real and pervasive involvement of the state in the total program.'" Id. at 228.

The Court, in effect, found that the State of Louisiana, charged, as it was, with the responsibility of maintaining an educational system within its borders, could not, by the establishment of a so-called "private agency" (85% of whose composition was public schools), discrim-

inate against another school's athletic program simply by reason of the racial makeup of its student body.

No charge is made here that the NCAA is being used by any state—or group of states, for that matter—to undertake racial discrimination in college athletics. Even the function of the NCAA differs radically from the function of the association in *St. Augustine, supra*. Neither Long Beach—concededly a state instrumentality—nor the State of California itself can direct the NCAA to conduct itself in any manner at all. Unlike the association in *St. Augustine, supra*, the NCAA has an existence separate and apart from the educational system of any state.

■ Conversely, a state's intercollegiate athletic program does not depend for its recognition, existence or maintenance upon any sufferance of the NCAA. Many state schools—though certainly, by no means, all of them—are members of the NCAA by their own choice and adopt certain—but not necessarily all— of the rules and regulations promulgated by the association as the standard by which they, independently, will operate their athletic programs. Memberships and concurrence by the various schools in all the rules and regulations propounded by the NCAA entail certain benefits. Thus, for example, the institution [8] may join in the NCAA sponsored post-season championship tournaments and appear in NCAA sponsored televised athletic contests. The adoption of NCAA regulations and of the benefits deriving therefrom is a decision which the institution can make independent of any interest of a particular athlete. In other words, the individual athlete has no interest—constitutionally protected or otherwise—in the institution's membership and participation in NCAA activities.

Thus, the NCAA is, quite simply, not a sovereign equivalent.

No one can deny that a declaration by the NCAA regarding an infraction of its rules, which declaration may affect the eligibility of a particular athlete to participate in intercollegiate sports, is of vital interest to that athlete. It affects his interscholastic athletic career and— depending upon his skills—can be of significant concern to his livelihood as a professional athlete. This consideration, however, does not resolve the issue. Placed in the context of this controversy, Long Beach is—borrowing a phrase from tort law—an independent intervening cause.

■ Voluntary concurrence of a state in a decision of an organization (NCAA) or other body—not a state, state instrumentality, or sovereign equivalent—does not make the acts of the organization (NCAA) "state action" in a constitutional sense. Rather, it is the *concurrence* by the state, its instrumentality or sovereign equivalent that is state action. It is this concurrence then, that must be measured by the requirements of due process and/or equal protection of the law. Unable to conform the act of concurrence to the constitutional requirements of due process or equal protection of the law, a state, its instrumentality or sovereign equivalent must withdraw its concurrence and proceed only in a constitutionally prescribed manner.

■ Long Beach argues that to place it in such circumstances puts it on the horns of a dilemma.[9] In its action declaring McDonald and Pondexter ineligible, Long Beach relies for its justification upon the compulsion entailed in its NCAA membership. However, Long Beach can neither prevent constitutional consideration of its action by abdicating

---

8. When the word "institution" is used it is recognized that the reference is to a state-controlled college or university and therefore the activities of college or university involve state action.

9. The dilemma is somewhat academic in light of the other violations cited against Long

Beach making it ineligible for post-season championship tournaments and television.

These restrictions arose from the procedures of the NCAA which vis-a-vis Long Beach, certainly pass constitutional muster even if NCAA activity would be found to be state action.

its responsibility to an otherwise immune form of organization, nor use its own independent action—that of concurrence in NCAA procedures—to change otherwise purely private action into state action for constitutional purposes. It is the act of the state or its sovereign equivalent that must be measured by constitutional standards; for in the measure of compelling interest, how can a private educational institution under the same compulsion of membership in the NCAA be made to choose between nonmembership in the NCAA or the attainment of sovereign equivalence? If NCAA action is state action, then the concurring action of its members—both public and private—is also state action. The statement of this result makes patent its absurdity.

The factual material presented to the Court makes clear that the NCAA does not—without the independent concurrence of its members—have any power to suspend or otherwise discipline an athlete who is claimed to have violated the standards set forth in its rules and regulations. States and sovereign equivalents, however, cannot so easily escape their constitutional mandate.[10]

Some argument was made of derivative rights inuring to McDonald and Pondexter from the membership of Long Beach in the NCAA. Little need be said about these contentions except that, if indeed their rights are derivative, Long Beach has not only had its hearing but also, as a sovereign equivalent, can make no claim to violation of due process since it is not a person within the meaning of the Fourteenth Amendment. In any event, how can a state or its equivalent complain of the constitutional infirmities of what is presumably its own state action?

With the determination that the NCAA action complained of herein does not amount to state action, the plaintiffs McDonald and Pondexter have no standing to claim invasion of any protectible interest under the United States Constitution as to the NCAA. Their complaint, therefore, as to the NCAA, must be dismissed.

California State University Long Beach and all those acting in concert with it and/or acting under its direction or subject to its control should be and are hereby enjoined and restrained pending the trial in this matter from:

(a) Applying or imposing any sanction or continuing in effect any sanction previously imposed against Glenn S. McDonald and/or Roscoe Pondexter declaring them ineligible for further participation in intercollegiate athletics as a member of any team sponsored and/or maintained by California State University Long Beach.

(b) This injunction shall be effective pending trial of this matter or until Glenn S. McDonald and/or Roscoe Pondexter are afforded a hearing and a determination is made therein, whichever shall first occur. The aforesaid hearing and determination shall be had pursuant to Chancellor's Executive Order 148 and shall concern themselves with the allegations which resulted in the plaintiffs' ineligibility to participate in interscholastic athletics.

(c) Bond upon the preliminary injunction pursuant to Rule 65(b) Federal Rules of Civil Procedure is set at $100.00.

Appendix A to follow

---

10. The intangible asset accruing to an institution by reason of its post-season championship and television participation cannot outweigh its individual responsibility to the Constitution. The players' share of the intangible assets is—at best—a fleeting instant in the history of athletics. How many can remember the players in 7 out of the last 9 NCAA national championship basketball tournaments? But, no one can really forget U.C.L.A.

## APPENDIX A

*Official Procedure Governing The NCAA*
*Enforcement Program*

*As approved and adopted by the Council and*
*Convention of the Association*

> Individuals employed by or associated with member institutions for the administration, the conduct or the coaching of intercollegiate athletics are, in the final analysis, teachers of young people. Their responsibility is an affirmative one and they must do more than avoid improper conduct or questionable acts. Their own moral values must be so certain and positive that those younger and more pliable will be influenced by a fine example. Much more is expected of them than of the less critically placed citizen.
>
> All representatives of educational institutions are expected to cooperate fully with the NCAA investigative staff, Committee on Infractions and Council to further the objectives of the Association and its enforcement program. The enforcement procedures are an essential part of the intercollegiate athletic program of each member institution and require full and complete disclosure by all institutional representatives of any relevant information requested by the NCAA investigative staff, Committee on Infractions or Council during the course of an inquiry.

Section 1. The Council shall designate a Committee on Infractions which shall be responsible to administer the NCAA enforcement program. The Committee shall: (1) consider complaints which may be filed with the Association charging the failure of any member to maintain the academic or athletic standards required for membership or the failure of any member to meet the conditions and obligations of membership in the Association; (2) provide general guidance to the NCAA investigative staff in the development of information related to alleged violations; (3) determine facts related to alleged violations and find violations of NCAA rules and requirements; (4) impose appropriate penalties on a member found to be in violation, or recommend to the Council suspension or termination of membership; (5) carry out any other duties directly related to the administration of the Association's enforcement program. The Committee shall be composed of five members, one of whom shall serve as chairman. Three members present and voting shall constitute a quorum for conduct of Committee business, it being understood that the chairman shall make a special effort to have full Committee attendance when major infractions cases involving violations are to be considered.

Section 2. All allegations and complaints relative to a member's failure to maintain the academic or athletic standards required for

membership, the member's violation of the legislation or regulations of the Association, or the member's failure otherwise to meet the conditions and obligations of membership, shall be received by the Committee or the Association's executive director and channeled to the NCAA investigative staff. The investigative staff, so far as practicable and under the general guidance of the Committee, shall make a thorough investigation of all such charges which are received from responsible sources and are reasonably substantial. The investigative staff may conduct a preliminary inquiry to determine whether there is adequate evidence to warrant an official inquiry, and in conducting this inquiry the services of a field investigator may be used. Under the general guidance of the Committee, the investigative staff also may initiate an investigation on its own motion when it has reasonable cause to believe that a member is or has been in violation of its obligations as a member of the Association.

Section 3. If the Committee on Infractions, after consideration of the information which has been developed and after consultation with the investigative staff, determines that there has been a violation not of a serious nature, it may privately reprimand and censure without a hearing; if it determines that an allegation or complaint warrants an official inquiry, it shall determine its scope and thrust and direct a letter to the chief executive officer of the member involved (with copies to the faculty representative and athletic director of the member, to the executive officer of the allied conference of which the institution is a member and to the Association vice-president of the district in which the member is located) fully informing him of the matter under inquiry and requesting his cooperation to the end that the facts may be discovered. By this letter, the Committee shall call upon the chief executive officer of the member involved for the disclosure of all relevant information and may require his appearance or the appearance of his representative before the Committee at a time and place which is mutually convenient, if such appearance is deemed necessary by the Committee. Similarly, a member which is subject to official inquiry shall, upon its request, be given the opportunity to have representatives appear before the Committee. If a member declines to meet with the Committee after having been requested to do so, the member shall not have the right to appeal either the Committee's findings of facts and violations or the resultant penalty.

Section 4. (a) If a member appears before the Committee to discuss its response to the Committee's official inquiry, the hearing shall be directed toward the general scope of the official inquiry but shall not preclude the Committee from finding any violation resulting from information developed or discussed during the hearing. During the hearing, the investigative staff first shall present the information which its investigation has developed. The member will then present its explanation of the alleged violations and questionable practices, and any other arguments or information which it deems appropriate in the Committee's consideration of the case. The Committee, at the discretion of any of its members, shall question representatives of the member or the investigative staff, as well as any other persons appearing before it, in order to determine the facts of the case. Further, under the direction of the Committee, questions and information may

be exchanged between and among all parties participating in the hearing. The exact procedure to be followed in the conduct of the hearing will be determined by the Committee.

(b) After all presentations have been made and the hearing has been concluded, the Committee shall excuse all others from the hearing and the Committee shall make its determinations of fact and violation. In arriving at its determinations, it may request additional information from any appropriate source including the member or the investigative staff. If the Committee determines there has been a violation or questionable practice, it shall impose an appropriate penalty, or it may recommend to the Council suspension or termination of membership in an appropriate case. The finding of a violation or questionable practice shall be by majority vote of the members of the Committee present and voting. The imposition of a penalty or recommended action shall require the favorable vote of at least three members of the Committee.

Section 5. The Committee, without prior public announcement, shall be obligated to promptly submit a written report, which sets forth its findings and penalty to be imposed, to the chief executive officer of the member (with copies to those individuals receiving copies of the official inquiry) which has been subject to the official inquiry. The member then shall have the right to give written notice of appeal of the Committee's findings, the penalty, or both, to the Council. To be considered by the Council, the notice of appeal must be received by the NCAA executive director, Kansas City, Missouri, not later than 15 calendar days from the date the member institution received the Committee's report. The member's notice of appeal shall contain a statement of the date the Committee's report was received by the chief executive officer. If the notice of appeal is not received within the 15-day period, or the member determines not to appeal, the action of the Committee will be promptly announced by the Committee through the NCAA executive office or at any other site determined by the Committee. The Committee shall forward a report of the case to the Council at the time of public announcement. If appropriate notice of appeal is received, no public announcement will be made until conclusion of the case by the Council. Determinations of fact and violations arrived at in the foregoing manner by the Committee, or by the Council on appeal, shall be final, binding and conclusive, and shall not be subject to further review by the Council or any other authority.

Section 6. The Committee shall be obligated to submit a written summary statement to the Council on each case that is subject to appeal, and it shall include:

(1) A statement of the origin of the case.

(2) Violations of NCAA requirements or questionable practices in light of NCAA requirements, as determined by Committee.

(3) Related factors appropriate for consideration in judgment of case.

(4) Disciplinary or corrective actions taken by institution or conference, or any other agency involved in particular incident.

During an appeal to the Council, the chairman or another member of the Committee shall present the Committee's report. The member institution, if it desires to be represented before the Council, may challenge the Committee's finding of fact or penalty, or both. The Council then shall act upon the member's appeal and may accept the Committee's findings and penalty, alter either one or both or make its own findings and impose a penalty which it believes appropriate.

Section 7. (a) The Constitution of the Association provides that disciplinary or corrective actions other than termination or suspension of membership may be effected during the period between annual Conventions by the Committee on Infractions. As a guiding principle, the NCAA penalty should be broad and severe if the violation or violations reflect a general disregard for the governing rules; in those instances in which the violation or violations are isolated and of relative insignificance, then the NCAA penalty shall be specific and limited. Previous violations of NCAA legislation shall be a contributing factor in determining the degree of penalty.

Among the disciplinary measures, singly or in combination, which may be adopted by the Committee or Council and imposed against an institution are:

(1) Reprimand and censure;

(2) Probation for one year;

(3) Probation for more than one year;

(4) Ineligibility for one or more National Collegiate Championship events;

(5) Ineligibility for invitational and postseason meets and tournaments;

(6) Ineligibility for any television programs subject to the Association's control or administration;

(7) Ineligibility of the member to vote or its personnel to serve on committees of the Association, or both;

(8) Requirement that a member institution which has been found in violation show cause why:

(i) a penalty or an additional penalty should not be imposed if, in the opinion of the Committee (or Council), it does not take appropriate disciplinary or corrective action against athletic department personnel involved in the infractions case, any other institutional employee if the circumstances warrant, the student-athlete involved or representatives of the institution's athletic interests; or

(ii) a recommendation should not be made to the membership that the institution's membership in the Association be suspended or terminated if, in the opinion of the Committee (or Council), it does not take appropriate disciplinary or corrective action against the head coach of the sport involved, any other institutional employee if the circumstances warrant, the student-athlete involved or representatives of the institution's athletic interests.

"Appropriate disciplinary or corrective action" may include, for example, termination of the coaching contract of the head coach and any assistants involved; suspension or termination of the employment status of any other institutional employee who may be involved; declaration of ineligibility for any student-athlete involved for a specific period; severance of relations with any representative of the institution's athletic interests who may be involved; the debarment of the head or assistant coach from any coaching, recruiting or speaking engagements for a specified period, and the prohibition of all recruiting in a specified sport for a specified period. The nature and extent of such action shall be the determination of the institution after due notice and hearing to the individuals concerned, but the determination of whether or not the action is appropriate in the fulfillment of NCAA policies and principles, and its resulting effect on any institutional penalty, shall be solely that of the Committee (or Council). Where this requirement is made, the institution shall show cause, or in the alternative, shall show the appropriate disciplinary or corrective action taken, in writing, to the Committee (or Council) within fifteen (15) days thereafter. The Committee (or Council) may, without further hearing, determine on the basis of such writing whether or not in its opinion appropriate disciplinary or corrective action has been taken, and may impose a penalty or additional penalty, take no further action, or it may, by notice to the institution, conduct a further hearing at a later date before making a final determination.

(b) In some instances, an institution is rendered ineligible to appear on television programs administered or controlled by the Association. When an institution is banned from such television programs, the penalty shall specify that the institution may not enter into any contracts or agreements for such appearances until the institution's probationary status has been terminated and it has been restored to full rights and privileges of membership.

(c) When an institution has been found to be in violation of NCAA requirements, and the report reflects academic violations or questionable academic procedures, the NCAA executive director shall be authorized to forward a copy of the report to the appropriate regional accrediting agency.

(d) If the Committee, after a review of institutional or conference action taken in connection with a rule infraction, concludes that the corrective or punitive action taken by the institution or conference is representative of and consistent with NCAA policies and principles, the Committee may exercise the discretion to take no further action. Further, self-disclosure shall be considered in establishing penalties, and if an institution uncovers a violation prior to its being reported to the NCAA and/or its conference, such disclosure shall be considered as a mitigating factor in determining the penalty. Also, the Committee may adopt a penalty comparable to the institutional or conference penalty without conducting a hearing with the member; however, the

Committee shall notify the member of the NCAA rules or regulations violated and the proposed penalty, and advise the member of the opportunity for a hearing. The member must request such a hearing within fifteen days of the receipt of the Committee's notification, if such a hearing is to be held. If a member requests such a hearing, the procedures outlined in Section 4 shall be followed. In the absence of a member's request for a hearing, the Committee shall impose the penalty and if appropriate make public announcement of its action. Punitive or corrective action taken by an institution or conference shall not prevent the Committee from taking any punitive action which it deems advisable or warranted in any case. In cases of serious violation, the NCAA should not leave the discipline in such cases exclusively to an institution or conference.

Section 8. When a penalty has been imposed and publicly announced, there shall be no review of the penalty except upon a showing of newly discovered evidence which is directly related to the findings in the case, or that there was a prejudicial error in the procedure which was followed in the processing of the case by the Committee. Any institution which initiates such a review shall be required to submit a brief of its appeal to the Committee at least 30 days prior to a Committee meeting and furnish sufficient copies of the brief for distribution to all members of the Committee; thereupon, the Committee shall review the brief and decide by majority vote whether it shall grant a hearing of the appeal. Disciplinary measures imposed by the institution or its conference, subsequent to the NCAA's action, may be considered to be "newly discovered evidence" for the purposes of this paragraph. If a hearing of the appeal is granted, the Committee may reduce or eliminate any penalty, but may not impose any new penalty. The Committee's decision with respect to the penalty shall be final and conclusive for all purposes.

Section 9. When the Committee or NCAA Council finds that there has been a violation of the Constitution or Bylaws affecting the eligibility of an individual student-athlete or student-athletes, the institution involved and its conference (if the institution holds such affiliation with an allied member) shall be notified of the violation and the name(s) of the student-athlete(s) involved, it being understood that if the institution fails to take appropriate action, the involved institution shall be cited to show cause under the Association's regular enforcement procedures why it should not be disciplined for failure to do so. It is understood that if an institution concludes that continued application of the rule(s) would work an injustice on any student-athlete, an appeal shall be submitted to the Council and promptly acted upon by the body or a sub-committee designated by it.

Section 10. The Committee on Infractions and the Council shall treat all cases before them as confidential, except as provided above, until the same have been announced in accordance with the prescribed procedures. Any member of the Committee on Infractions or Council who is directly connected with an institution under inquiry shall not take part in any NCAA proceedings connected with the case before the Committee or the Council.