HOWARD UNIVERSITY et
al., Appellants,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION.

HOWARD UNIVERSITY et al.,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, Appellant.

Nos. 74–1166, 74–1169.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 13, 1975.

Decided March 25, 1975.

Dorsey Edward Lane, Washington, D. C., for appellants in No. 74–1166 and appellees in No. 74–1169.

Michael Scott and Charles F. Clarke, Cleveland, Ohio, of the bar of the Supreme Court of Ohio, pro hac vice by special leave of Court, with whom Philip B. Brown, Washington, D. C., was on the brief for appellee in No. 74–1166 and appellant in No. 74–1169.

Before BAZELON, Chief Judge, TAMM, Circuit Judge, and RICHEY,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Howard University (Howard) and one of its student-athletes Mori Diane, sought injunctive and declaratory relief in district court, alleging that their Constitutional rights had been abridged because certain members of the Howard soccer team, including Diane, were found by the National Collegiate Athletic Association (NCAA) to have participated in intercollegiate soccer competition and in two NCAA championships while ineligible under applicable NCAA rules; as a result, sanctions were imposed by the NCAA against Howard and, as mandated by NCAA rules, by Howard against Diane. District Court Judge Gerhard Gesell found that state action was present, that the NCAA procedures invoked did not violate due process, and that while two challenged NCAA rules passed equal protection scrutiny, a third, the foreign-student rule, violated equal protection in that it created an unjustifiable alienage classification. Howard University v. NCAA, 367 F.Supp. 926 (D.D.C.1973). On cross-appeals, we affirm.

I. Facts

Plaintiff-appellant Howard University is a private institution of higher learning. Plaintiff-appellant Mori Diane is a student at Howard and a member of its intercollegiate soccer team. Defendant-cross-appellant NCAA is a voluntary, unincorporated association of colleges, universities and other institutions of higher learning, of which approximately fifty percent are state- or federally-supported. Howard has been at all relevant times a member of this Association. A. 20–21.

The NCAA is governed by a large and detailed manual which has been made part of the record. A. 149–258. The manual contains the NCAA's Constitution and By-laws, promulgated at the annual convention of members, and interpretations and executive actions arising from them. Between conventions, Association affairs are conducted by an eighteen-member Council, its executive committee and a paid staff. Investigators and staff attorneys interpret and enforce the large body of NCAA rulings and precedents. 367 F.Supp. at 928; see A. 194–98.

The NCAA's basic purpose, contained in its constitution, includes initiating and stimulating intercollegiate athletic programs, encouraging member organizations "to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism,"

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

and supervising the conduct of, and establishment of eligibility standards for, events promoted by the Association. NCAA Constitution art. II §§ 1(a), (c), (f), A. 151. To implement those goals, the Association has adopted extensive rules and regulations, including those under attack here. A prerequisite to an institution's membership in the NCAA is adherence to and enforcement of these rules. All sanctions passed by the Association are imposed on its member institutions. NCAA Constitution, art. IV §§ 1, 2, A. 158.

Howard University finished third in the 1970 NCAA soccer championship and won the national championship in 1971. The Howard team consisted totally of alien student-athletes. In January, 1972, the NCAA staff received a letter attaching a *Washington Post* sports article and suggesting possible inquiry into the Howard soccer program. The article featured Keith Aqui, a star of the soccer team and a 25-year-old freshman at Howard. A. 27–28. Shortly thereafter, Warren S. Brown, Secretary of the NCAA's Committee on Infractions, initiated an exchange of correspondence with Howard's Director of Athletics Leo F. Miles, seeking eligibility information about Mr. Aqui and other members of the soccer team. A. 29–39. On June 9, 1972, Mr. Brown forwarded the matter to the Committee on Infractions which assigned a staff investigator to the case. A. 40.

On November 8, 1972, after receiving investigative reports, the Committee sent to Dr. James Cheek, President of Howard University, a notice of an "Official Inquiry" alleging violations of specified provisions of the NCAA Constitution, By-laws, and Executive Regulations, and directing interrogatories to the University concerning the allegations. Dr. Cheek was advised that the Committee on Infractions would meet on December 19, 1972 and was invited to send a representative. A. 74–80. On November 17, 1972, Dr. Cheek responded by letter which designated Athletic Director Miles as Howard's representative at the meeting. A. 83. On December 11th, Howard forwarded the requested responses to the Official Inquiry. A. 89–104.

At the December 19th meeting, the Committee reviewed evidence that Howard violated three NCAA rules. A. 114–19. In particular, evidence was offered that two student-athletes participated in the 1971 NCAA soccer championship in violation of the foreign student rule. That rule [1] operates against an alien student-athlete who prior to his matriculation at a member institution participates after his nineteenth birthday as a representative of any team in a foreign country; for each year of such participation, the rule eliminates one year of his potential NCAA championship eligibility. Evidence also indicated that one student apparently violated the five-year rule [2] which dictates that a student-athlete's five potential years to complete his athletic eligibility commences when he first enrolls at a collegiate institution. Further, information was introduced that three student-athletes had received athletic-related financial aid during their freshman year without having complied with the NCAA's 1.600 rule. The 1.600

---

1. *The "Foreign-Student" Rule.* Any participant in a National Collegiate Athletic Association event must meet all of the following requirements for eligibility . . .. He must not previously have engaged in three seasons of varsity competition after his freshman year, it being understood that: . . . Participation as an individual or as a representative of any team whatever in a foreign country by an alien student-athlete in each twelve-month period after his nineteenth birthday and prior to his matriculation at a member institution shall count as one year of varsity competition. NCAA By-law 4–1(f)(2), A. 173.

2. *The "Five-Year" Rule.* An institution shall not permit a student-athlete to represent it in intercollegiate athletic competition unless he meets the following requirements of eligibility: He must complete his seasons for participation within five calendar years from the beginning of the semester or quarter in which he first registered at a collegiate institution. . . . NCAA Constitution art. III § 9(a), A. 156.

rule[3] mandates that member institutions limit financial aid and freshmen eligibility to student-athletes who have predicted minimum grade point averages of at least 1.600 (based upon a 4.000 scale) as determined by NCAA-approved tables.

At the hearing, Howard participated in the discussion of the issues, presented evidence rebutting the allegation that one particular student-athlete's participation violated the 1.600 rule, and was invited to make a statement. After Howard's representatives departed, the Committee reviewed the evidence and found Howard in violation of the three NCAA rules. A. 114–19.

The Committee's written report was forwarded by letter to Howard on December 22, 1972, which also indicated that the NCAA Governing Council would take up the matter on January 9th; Howard's participation was again invited. A. 120–29. After hearing the report and a statement by Howard's representatives, the Council adopted a resolution which found five violations by Howard of NCAA rules, including utilization of ineligible players during the 1970 and 1971 NCAA championships and imposed a one-year probation during which Howard's soccer team would be ineligible for post-season competition. A. 133–36. Pursuant to NCAA Executive Regulation 2–3–(e), the Council informed Howard that its third-place finish in the 1970 and its first-place finish in the 1971 soccer championship had been vacated and requested the return of the team trophies. A. 142.

In March, 1973, the University stated its refusal to comply with the NCAA's request and its desire to press the issues in a "higher forum". A. 144–45. Howard was informed that it could appeal the Council's decision to a special NCAA convention called for August, 1973. A. 146–48. No such appeal was taken before the filing of this suit.

The case was tried to Judge Gesell on a partially stipulated record of NCAA documents and the NCAA proceedings recounted above. After hearing both testimony and argument, Judge Gesell found subject matter jurisdiction under 28 U.S.C. § 1331 (1970), holding that the NCAA's activities constituted state action. The court upheld the five-year and 1.600 rules against an equal protection challenge, finding the rationale behind the rules to be both reasonable and non-discriminatory. However, Judge Gesell found that the foreign-student rule violated equal protection in that it created an "explicit classification according to alienage and one that is, on balance, unjustified." Finally, the court rejected the argument that the NCAA enforcement proceedings had denied plaintiffs-appellants due process. Although enjoining further enforcement of the foreign-student rule, the court's decision, by upholding the other rules under attack, left undisturbed the sanctions imposed by the NCAA. 367 F.Supp. at 929–31. These appeals followed.

## II. Jurisdiction—The Question of Governmental Action

■ The district court found subject-matter jurisdiction under 28 U.S.C. § 1331 (1970):

Under all of these circumstances, while Howard is not itself a governmental institution, its athletic affairs and related educational policies are affected by the concerted action of the many state and federal institutions that participate as NCAA members in

---

**3.** *The "1.600 Rule".* A member institution shall not be eligible to enter a team or individual competitors in an NCAA-sponsored meet, unless the institution in the conduct of all its intercollegiate athletic programs: (1) Limits its scholarship or grant-in-aid awards (for which the recipient's athletic ability is considered in any degree), and eligibility for participation in athletics or in organized athletic practice sessions during the first year in residence to student-athletes who have predicted minimum grade point averages of at least 1.600 (based on a maximum of 4.000) as determined by the Association's national prediction tables or Association-approved conference or institutional tables. . . . NCAA By-law 4–6(b)(1), A. 175.

the promulgation and enforcement of the Association's rules, regulations and procedures. This involvement by state and federal institutions is pervasive, and bears directly upon the subject matter of the complaint. The actions of these institutions, in short, caused the alleged injuries. Thus, government action is clearly shown and the Court has jurisdiction. *See* Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

367 F.Supp. at 929 (footnote omitted). In its cross-appeal, the NCAA vigorously disputes the correctness of this holding and argues that the case should be dismissed for lack of jurisdiction.

It is axiomatic that only governmental, not private action is subject to the constitutional restraints of the fifth and fourteenth amendments. *See, e. g.*, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Bryant v. Jefferson Federal Savings and Loan Ass'n, 166 U.S.App.D.C. ——, ——, 509 F.2d 511, 513, (1974). However, "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). In determining whether "significant government involvement" exists so that the challenged action may be measured against the constitutional protection, *see Moose Lodge, supra*, 407 U.S. at 173, 92 S.Ct. 1965, courts must make a particularized inquiry into the circumstances of each case and reach this decision by "sifting facts and weighing circumstances." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). The government may have "so far insinuated itself into a position of interdependence . . . that it must be recognized as a joint participant in the challenged activity . . .." *Id.* at 725, 81 S.Ct. at 862. Moreover, the government's involvement need not be either exclusive or direct; governmental action may be found even though the government's participation "was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation." United States v. Guest, 383 U.S. 745, 755–56, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966).[4]

We recognized that we are not the first court, nor the first circuit court to confront the question of the applicability of constitutional restraints to the NCAA. The Ninth Circuit in Associated Students, Inc. v. NCAA, 493 F.2d 1251, 1254–55 (9th Cir. 1974), found state action, adopting the analysis of the district court in Parish v. NCAA, 361 F.Supp. 1214, 1219 (W.D.La.1973), which reached its conclusion on an entanglement theory.[5] Recently, the Fifth Circuit affirmed the district court decision in *Parish*. 506 F.2d 1028 (5th Cir. 1975). The Fifth Circuit noted that "state-supported educational institutions and their members

---

4. The state action requirement also arises in cases dealing with the "under color of state law" standard of 42 U.S.C. § 1983 (1970). The Supreme Court has indicated that the "under color of state law" requirement is equivalent to the constitutional state action standard, United States v. Price, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), and principles derived from both lines of cases are used interchangeably. *See, e. g.*, Parish v. NCAA, 506 F.2d 1028, 1031 n.6 (5th Cir. 1975); Bryant v. Jefferson Federal Savings and Loan Ass'n, 166 U.S.App. D.C. ——, —— n.4, 509 F.2d 511, 513 n.4 (1974).

5. The district court in *Parish* relied heavily on the high school line of cases, discussed *infra* and opined:

Although NCAA is a nationwide association, it does control public schools which are State agencies to the extent that the high school athletic associations control their respective members at least insofar as regulations, sanctions, and discipline are concerned. Moreover, State funds are used by public schools to pay membership dues in this association.

and officers play a substantial, although admittedly not pervasive, role in the NCAA's program," *id.* at 1032 (footnote omitted), and that such state participation in a nominally private activity "is a well recognized basis for a finding of state action."[6] Other courts facing the issue have also held that state action was present.[7]

Moreover, the affairs of ostensibly private organizations in several states which regulate high school athletic programs and other extracurricular activities have consistently been found to constitute governmental action. While the first holdings involved cases alleging racial discrimination, *see, e. g.,* Louisiana High School Athletic Ass'n v. St. Augustine High School, 396 F.2d 224 (5th Cir. 1968), state action has also been found in cases challenging clearly non-racial athletic eligibility and discipline rules, *see; e. g.,* Wright v. Arkansas Activities Ass'n, 501 F.2d 25 (8th Cir. 1974) (off-season football practices); Mitchell v. Louisiana High School Athletic Ass'n, 430 F.2d 1155 (5th Cir. 1970) (eight-semester rule), sex discrimination, *see, e. g.,* Brenden v. Independent School Dist. 742, 342 F.Supp. 1224 (D.Minn.1972), aff'd, 477 F.2d 1292 (8th Cir. 1973); Reed v. Nebraska School Activities Ass'n, 341 F.Supp. 258 (D.Neb.1972), and regulation of non-athletic activities, *see* Baltic Independent School Dist. No. 115

v. South Dakota High School Activities Ass'n, 362 F.Supp. 780 (D.S.D.1973) (high school debate tournaments).[8] In all these cases, the courts recognized that the organizations were private, voluntary associations, yet found state action by focusing on the facts that membership consisted substantially of public high schools which provided personnel, facilities and financial support, that the organizations' rules were promulgated by vote of the members, including the public schools, and that the private organizations significantly regulated and affected the programs of these public entities, including, *inter alia,* conducting state championship events, imposing restrictions on practices and eligibility, and conducting investigations and meting out sanctions.[9] Consequently the organizations were sufficiently intertwined with state instrumentalities, whose involvement was significant, albeit not exclusive, as to be subject to constitutional restraints.

Against this considerable body of precedent, the NCAA relies heavily on the district court decision in McDonald v. NCAA, 370 F.Supp. 625 (C.D.Cal.1974), which purported to distinguish the high school cases and which held that the activities of the NCAA were not state action. While the vitality of its holding has been undercut by the Ninth Circuit's subsequent decision in *Associated Stu-*

**6.** Moreover, the *Parish* court asserted that regulation of intercollegiate athletics was beyond the effective reach of any single state and that there was little doubt "that were the NCAA to disappear tomorrow, government would soon step in to fill the void." Thus, the NCAA by taking upon itself the role of coordinator and overseer of college athletics is performing a traditional governmental function. 506 F.2d at 1032–33.

The Seventh Circuit, in upholding the constitutionality of the "2.0 Rule", which has superceded the "1.6 Rule" under attack here, did not reach the state action question. Schubert v. NCAA, 506 F.2d 1402 (7th Cir. 1974).

**7.** Smith v. Southern Methodist University, CA–3–74–895B (N.D.Tex.1974) (unreported order); Buckton v. NCAA, 366 F.Supp. 1152 (D.Mass.1973); Curtis v. NCAA, C–712088

ACW (N.D.Cal.1972) (unreported opinion). *See also* Note, Judicial Review of Disputes Between Athletes and the National Collegiate Athletic Association, 24 Stan.L.Rev. 903, 916–28 (1972).

**8.** *See also* Oklahoma High School Athletic Ass'n v. Bray, 321 F.2d 269 (10th Cir. 1963) (eligibility); Gilpin v. Kansas State High School Activities Ass'n, Inc., 377 F.Supp. 1233 (D.Kan.1973) (sex discrimination); Taylor v. Alabama High School Athletic Ass'n, 336 F.Supp. 54 (M.D.Ala.1972) (disciplining basketball team). *Compare* Kelly v. Wisconsin Interscholastic Athletic Ass'n, 367 F.Supp. 1388 (E.D.Wis.1974) (complaint dismissed for failure to allege state action).

**9.** *See, e. g.,* Gilpin v. Kansas State High School Activities Ass'n, Inc., *supra* note 8, 377 F.Supp. at 1233; Reed v. Nebraska School Activities Ass'n, 341 F.Supp. 258, 261 (D.Neb.1972).

*dents, supra,* the *McDonald* analysis still deserves scrutiny. *McDonald* distinguished the high school cases on two grounds. First, the district court focused on the *St. Augustine* case, the genesis of the high school line of cases, and dismissed it as a racial discrimination case where a public body attempted to cloak its unconstitutional actions behind a private entity. 370 F.Supp. at 630–31. Second, the court argued that the NCAA's function differs from the function of the Association in *St. Augustine* in that no one state or state's instrumentalities control the NCAA, nor does the NCAA regulate the athletic program of a particular state. *Id.* at 631.

The *McDonald* analysis contains, however, fatal flaws. While *St. Augustine* dealt with racial discrimination, the high school cases, as indicated above, now clearly extend constitutional scrutiny to the types of rules and regulations at issue here. As to the second point, the district judge misperceived the issue. It is undeniable that the NCAA, unlike the state athletic associations, is not the delegated body which is the substituted overseer of one particular state's athletic program. *Compare* Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). However, that analysis does not resolve the question of whether the degree of NCAA regulation of and involvement in those universities' programs and the fact that half the NCAA's membership are public institutions sufficiently intertwines their interests and affairs so

that the NCAA is subject to the fifth and fourteenth amendments. It is that question that the Fifth and Ninth Circuits and the district court in this case, properly relying in part on the high school cases, have answered affirmatively.[10] We agree.

Approximately half of the NCAA's 655 institutional members are state- or federally-supported. Since financial contribution to the NCAA is based upon institutional size, and since public universities generally have the largest student bodies, the public institutions provide the vast majority of the NCAA's capital (the NCAA's annual administrative budget at the time of the suit being $1.3 million). A. 179, 343. Principal power in the Association lies with the Convention, which is made up of representatives of the member institutions. The Convention elects the governing Council and the NCAA's principal officers, adopts and amends the constitution and by-laws, and reviews all Council and committee actions. As can be seen from this description, the state instrumentalities are a dominant force in determining NCAA policy and in dictating NCAA actions. That conclusion is buttressed by reference to the record before us which documents that both the President and Secretary-Treasurer were representatives of public instrumentalities and that state instrumentalities traditionally provided the majority of the members of the governing Council and the various committees.[11] A. 198–207. Thus, governmental

---

10. It is because the question in this case is one of entanglement that the Supreme Court's latest pronouncements on state action, Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) and Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), can be of limited guidance to us. In *Moose Lodge,* the Court determined that the state's grant of a liquor license, pursuant to a regulatory scheme, to a private club did not make the club's discriminatory membership policy state action. 407 U.S. at 171–77, 92 S.Ct. 1965. The Court in *Jackson* held that a heavily regulated utility with a partial monopoly was not a state actor when it terminated service in a manner that the state regulatory commission found permissible under state law. 419 U.S.

345, 95 S.Ct. 449. Unfortunately, neither *Moose Lodge,* analyzing state action through the grant of a benefit, or *Jackson,* addressing state action through regulation of a monopoly and delegation of a public function, offer any analysis to resolve the question before us of entanglement through dominant membership and participation.

11. While, unlike in the high school cases, no particular state's instrumentalities are able to control the association, it is clear that all NCAA actions are undertaken on the votes of public instrumentalities, and it would not overstate the practical situation to assert that no NCAA action could be taken by the Convention, Council, or any committee without the substantial support of the public instrumentalities.

involvement, while not exclusive, is "significant", and all NCAA actions appear "impregnated with a governmental character." *See Moose Lodge, supra;* Evans v. Newton, *supra.*

The NCAA's regulation and supervision over intercollegiate athletics is extensive and represents an immeasurably valuable service for its member institutions. The NCAA conducts championship events in most sports for the benefit of its member institutions.[12] The Association regulates the amateur status of student-athletes, sets financial aid policies, prescribes playing and practice seasons, fixes minimum academic standards, establishes standards for approved extra events and determines eligibility for intercollegiate competition and NCAA championships.[13] The NCAA also negotiates television contracts, the proceeds of which, $13,000,000 annually, flow directly to the participating schools, primarily the public universities. A. 343–46. The foregoing analysis indicates that the NCAA and its member public instrumentalities are joined in a mutually beneficial relationship, and in fact may be fairly said to form the type of symbiotic relationship between public and private entities which triggers constitutional scrutiny. *See* Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Burton v. Wilmington Parking Authority, *supra.*

If the NCAA was composed of solely public institutions, clearly state action would be present. In contrast, if the NCAA had no public members, its actions would be private for constitutional purposes. Drawing the line as to the requisite quantum of public participation to invoke fourteenth amendment protections is a difficult task indeed. However, that is unnecessary in this case where the degree of public participation

and entanglement between the entities is substantial and pervasive. In light of this substantial participation, we must agree with the Fifth Circuit's recent comment in *Parish*: "it would be strange doctrine indeed to hold that the states could avoid the restrictions placed upon them by the Constitution by banding together to form or to support a 'private' organization to which they have relinquished some portion of their governmental power." 506 F.2d at 1033. We hold that state action is present and that the district court correctly determined it possessed jurisdiction under 28 U.S.C. § 1331 (1970).

### III. Constitutional Challenges

In district court appellants Howard and Diane argued that the three applicable NCAA rules denied them equal protection and that the NCAA proceedings which culminated in sanctions against appellant Howard infringed upon their due process rights. We turn first to the equal protection challenge.

The Supreme Court has most recently articulated the generally applicable equal protection standard in its unanimous decision in Reed v. Reed, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971):

> the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. . . . A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

One student-athlete, Keith Aqui, was adjudged to have violated the five-

---

**12.** It is notable that many of these events take place at public university facilities, where they are hosted by the public instrumentalities.

**13.** Concededly, the NCAA's regulation is not as all-embracing as some of the high school associations discussed previously. For example, the NCAA exercises no control over offi-

cials, does not involve itself in scheduling or classroom teaching assignments for coaches, and cannot prohibit member schools from competing with non-member schools. Nevertheless, the NCAA regulation is pervasive, and similar enough to the high school associations so that we feel that those cases must be given great weight in resolving the question before us.

year rule.[14] The district court found that the rule "is designed to compel the regular progression of athletes through a four-year college curriculum without unnecessary or material delay" and "is reasonable and fundamental to the Association's objectives and in no way discriminates against aliens." 367 F.Supp. at 929. We agree. The rule was adopted to reflect the average time, four and one-half years, required to obtain a college degree. *See* A. 363–64. While there are undoubtedly other potential mechanisms to ensure an athlete's progress toward graduation, we see no indication that the method adopted is unreasonable or not substantially related to its objective. *See* Reed v. Reed, *supra.*

■ The 1.600 rule applies only to championship events. Its objectives are, *inter alia,* to reduce the recruitment and exploitation of young athletes who are not representative of the institution's student body and to limit athletic competition to actual *student*-athletes. 367 F.Supp. at 929; A. 343, 372. Howard argues that the rule, especially in light of the NCAA's Official Interpretation 418 (O.I. 418), violates the *Reed* standard. Appellant's Br. at 10–13.

O.I. 418 reads:

A student-athlete who practices or participates while ineligible under the [1.600 rule] shall be charged with the loss of one year of practice and varsity eligibility by his institution for each year gained improperly, which shall be the next year the student is in attendance. A student-athlete who receives financial aid while ineligible for such aid . . . shall be declared permanently ineligible . . . by his institution. The institution may appeal to the Council for a reduction of the ineligibility in either instance. The loss of eligibility may apply only at the institution involved in the violation.

A. 177. Appellants rely principally on the holding and reasoning of the district court opinion in Associated Students, Inc. v. NCAA, C. No. S–2754 (E.D.Cal. 1973), which opined that the rule as interpreted by O.I. 418 established an over-inclusive classification since it declares ineligible student-athletes who demonstrated by the conclusion of the first year that they had the ability to achieve academic success by actually earning at least 1.600 grade point average. However, since the filing of appellants' brief, the Ninth Circuit rejected the district court's reasoning and upheld the rule as interpreted as reasonably related to the objective behind it. Associated Students, Inc. v. NCAA, *supra,* 493 F.2d at 1256.

We find the Ninth Circuit's reasoning persuasive. One primary objective of the rule is to prevent member schools from granting scholarships to individuals who do not have a realistic chance of obtaining a degree. To effectuate that objective, the eligibility determination obviously must be made at the time of the student's application and certification. To adopt appellants' theory would permit member institutions to recruit ineligible athletes with the hope (or expectation) that they might meet prediction standards after their first year in college and thus become eligible for athletics during the remainder of their college career. In order to prevent such a complete undermining of the rule's legitimate objective, O.I. 418 requires ineligibility for an improperly certified athlete, regardless of his college academic record. A penalty need not be the best that might have been provided, but only reasonably related to the rule's purpose. We think that the 1.600 rule, as interpreted by O.I. 418, meets that test. *Accord, id.*; Parish v. NCAA, *supra. See*

14. Howard also attacks the rule's application in this case. The NCAA found that because Mr. Aqui attended Mausica College, Trinidad in 1965, his eligibility had expired prior to the 1970 season. A. 134. Howard contends that Mausica does not fall within the scope of the "collegiate institution" portion of the five-year rule. However, we discern no reason to disturb the NCAA's finding in light of appellant's admissions in the record of the rule's applicability to Aqui's attendance at Mausica. *See* A. 35, 473–74.

*also* Schubert v. NCAA, 506 F.2d 1402, (7th Cir. 1974).[15]

■ The district court did strike down the third rule at issue, the foreign-student rule. While it is somewhat unclear from the briefs and argument whether the NCAA places the correctness of that ruling in dispute here, we reach its merits and also find that the rule violates the equal protection guarantee. The rule clearly establishes an alienage classification, treating foreign student-athletes differently than American student-athletes, and thus must be subjected to close judicial scrutiny. In re Griffiths, 413 U.S. 717, 721, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The NCAA must demonstrate that its purpose is substantial and that the classification as drawn is necessary to the accomplishment of that purpose. In re Griffiths, *supra,* 413 U.S. at 721–22, 93 S.Ct. 2851.

We must conclude that the NCAA has failed to meet its burden. The NCAA claims that the rule's objective is to prevent older, foreign players from dominating championship competition because of age and experience. While the objective of preventing older players from dominating competition may be substantial, the classification as drawn results in an arbitrary discrimination against aliens. Under the rule, foreign student-athletes are penalized for activities (for example summer amateur participation) in which American athletes may freely compete. Thus, this suspect alienage classification as drawn cannot stand.

■ Turning to the due process question, we should first note our substantial doubts whether appellant Howard and especially appellant Diane have recognizable property interests subject to due process protections under the standards of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[16] However, even assuming a recognizable interest, appellants were in no way denied due process. The requirements of due process are flexible and vary as the particular situation demands. *See* Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). In the case *sub judice,* Howard, as sketched in Part I, *supra,* was given notice and full particulars of the charges against it, the right to participate and defend its action before both the Committee and Council, and the opportunity to appeal the rulings of both bodies to the NCAA Convention. Diane had an opportunity to appeal on his own behalf but failed to do so, 367 F.Supp. at 931, presumably because he was satisfied with Howard's representation of his interests. Moreover, his period of ineligibility was significantly reduced when Howard appealed on his behalf. We think that the NCAA has complied adequately with any due process responsibilities it might have had.

In sum, we conclude that state action is present, that the five-year and 1.600 rules, but not the foreign-student rule, pass constitutional scrutiny, and that no due process violation has occurred. The judgment, therefore, is

Affirmed.

---

15. We note the NCAA's representation that under the appeal authorized under O.I. 418, a student-athlete's ineligibility is consistently reduced to a period equal to that which he participated in athletics in violation of the rule. Appellant Diane apparently has had his period of ineligibility reduced in such a manner. *See* NCAA's Br. at 46.

Since we uphold the rules, we need not decide whether in light of our finding of state action vis-a-vis the NCAA, the actions of a private university, Howard, taken against appellant Diane, that are triggered by its voluntary concurrence in the decisions of the NCAA also constitute state action. *See* Parish v. NCAA, *supra* note 4, 506 F.2d at 1032 n. 10.

16. Several courts have held that the privilege of participating in athletics must be deemed to fall outside the protection of due process. *See, e. g.,* Parish v. NCAA, *supra* note 4; Mitchell v. Louisiana High School Athletic Ass'n, 430 F.2d 1155, 1157–58 (5th Cir. 1970); Oklahoma High School Athletic Ass'n v. Bray, *supra* note 8. Conceivably, Howard has a sufficient property interest in the trophies originally awarded in championship competition.