Robert L. PARISH et al.

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al.

Civ. A. No. 18733.

United States District Court,
W. D. Louisiana,
Shreveport Division.

March 27, 1973.

John Gallagher, Gallagher & Gallagher, J. Peyton Moore, Shreveport, La., for plaintiffs.

Arthur R. Carmody, Jr., and Samuel W. Caverlee, Wilkinson, Carmody & Peatross, Shreveport, La., George W. Gangwere, Jr., Swanson, Midgley, Eager, Gangwere & Thurlo, Kansas City, Mo., for defendants.

## OPINION

DAWKINS, Chief Judge.

Original plaintiffs, who are basketball players on the Centenary College team, have instituted this action requesting a preliminary and permanent injunction against the National Collegiate Athletic Association (NCAA) to prevent it from enforcing its ruling which in effect declares the plaintiffs ineligible to compete in interscholastic athletic competition at Centenary College.

The Court granted a temporary restraining order and extended it as allowed by the Federal Rules of Civil Procedure. The College not having been invited to any post-season tournament, the TRO was allowed to expire and a date was set for hearing upon whether a preliminary injunction should be granted. Thereafter, defendant filed motions to dismiss for lack of jurisdiction over the subject matter, for lack of a substantial federal question, for failure to join an indispensable party, for failure to state a justiciable controversy, for failure to exhaust administrative remedies, for failure to allege irreparable injury, and for lack of jurisdiction over the person, and an alternative motion for summary judgment. Centenary College was made a party plaintiff by order of this Court.

The parties, seeking a quick resolution of this matter, agreed to file a stipulation of facts pertaining to certain jurisdictional questions.

This Court is of the opinion that the original plaintiffs had no administrative remedies to exhaust—only the College does—through appeal procedures provided in the Constitution and Bylaws of the NCAA. Clearly, the plaintiffs have standing in this matter for they are directly affected by any ruling the NCAA promulgates that declares them ineligible to compete in interscholastic athletics in the school of their choice.

Next we turn to those jurisdictional issues which are presented to this Court by stipulation. Original plaintiffs base this Court's jurisdiction not only upon diversity, but also on the ground that the question arises under the Constitution and laws of the United States. Specifically, jurisdiction of this Court is invoked under Title 28 U.S.C. §§ 1343(3) and 1343(4) and Title 42 U.S.C. §§ 1981 and 1983. The stipulated facts are as follows:

1.

## CITIZENSHIP OF PARTIES FOR PURPOSES OF DIVERSITY SUBJECT MATTER JURISDICTION

Plaintiffs, as presently aligned by this Court, include five individuals who all are residents of and domiciled in the State of Louisiana and one NCAA member institution, Centenary College, which is a resident of and domiciled in the State of Louisiana.

Defendants include individual members of the NCAA council who are non-Louisiana domiciliaries. The NCAA is an unincorporated association whose headquarters and principal place of business is outside the State of Louisiana and who has member schools in Louisiana, including a number of public and private universities and colleges, including the member school involved in this proceeding, Centenary College.

## 2.

### MINIMUM CONTACTS FOR PURPOSES OF PERSONAL JURISDICTION OVER DEFENDANTS

Defendant, NCAA, has its headquarters and principal place of business in Kansas City, Missouri, and is an unincorporated association. Its member schools include many State and private colleges and universities in Louisiana, including the member school involved in this proceeding, Centenary College, which is a private institution. The members of the NCAA council who are also made nominal defendants are located in various States, all outside of Louisiana. NCAA has no offices, no property, no leases, no employees (whether staff, directors, or officers), no telephone listing, no books, records, bank accounts, or meetings or other internal affairs located in Louisiana.

NCAA never has qualified to do business in Louisiana with the Secretary of State; has no registered agent for service of process in Louisiana; and has not authorized the Secretary of State to accept service of process.

NCAA has approximately ten member institutions in Louisiana; it derives revenue in the form of dues from all member institutions within the State; it derives further revenue from activities it sponsors within this State, including the annual Grantland Rice Bowl, in Baton Rouge, and the Sugar Bowl, in New Orleans. NCAA derives additional revenue from television and radio broadcasts and gate receipts from games (NCAA championships, bowls, and special events), some of which originate and are broadcast in this State and on national television networks; and, on a larger scale, from broadcasts which originate in other States but are broadcast here. Its NCAA rules, regulations, and interpretations apply to its member institutions within this State which adopt them, as well as to all student athletes attending any of these institutions. Its sanctions, such as the one forming the basis of this suit, directly affect member institutions within Louisiana as well as student athletes attending the sanctioned institutions. NCAA officials, both in their supervisory and investigatory capacity, come to this State (as well as all other States) during investigations and in preparation for any contests it sponsors which originate in this State.

Contacts of NCAA which are of a "specific" nature because they are related to this particular case, are as follows: In conducting its investigation of Centenary College's admission procedures which ultimately resulted in the resolution of January 9, 1973, wherein Centenary College was placed on probation, its agents engaged in work here resulting in its confidential report No. 74, made by the NCAA Committee on Infractions, in Section V (information examined by committee) that practically all information gathered by the committee on infractions was based on memoranda, telephone calls and personal visits in this State. Approximately 22 items are set forth in that report, a copy of which is made a part of this stipulation.

The resolution of January 9, 1973, which forms the basis for this law suit (a copy of which has also been included as part of this stipulation) is a sanction directly affecting the plaintiffs in this case.

## 3.

### IS STATE ACTION SUFFICIENT FOR FEDERAL QUESTION SUBJECT MATTER JURISDICTION?

NCAA is a voluntary, unincorporated association of approximately 762 members, consisting of colleges and universities, conferences and associations, and other educational institutions, whose active members are four-year colleges and universities located throughout the United States, of which approximately fifty per cent (50%) are private institutions and approximately fifty per cent (50%) are public. The members are the institutions themselves and not the college and university presidents or other personnel. Its staff is paid from member-

ship dues and other revenues. The paid staff of NCAA is not covered by any State (in this context and hereinafter "State" means both federal and any or each of the fifty States) retirement act or in any other public capacity. There is no direct State funding of NCAA, for example by appropriations to NCAA as an association.

NCAA regulates eligibility and participation in its member schools (a facet of which is the subject matter of this proceeding). Other than NCAA championship functions, which in their context here include the annual NCAA basketball tournament, no contract forms for scheduling or other purposes are controlled by NCAA. The NCAA does not regulate or control lists or fees of game officials. In its own NCAA championship and bowl event, there is an NCAA regulation covering financial reports, contracts, officials, and other requirements. NCAA does not have power to prohibit member schools from competing with non-member schools. There is no control by it over member school curricula, for example, the number of hours that athletic coaches teach in the classroom, if any. All-star teams are not limited to NCAA members but are chosen by those bodies who desire to make such awards. The 1.6 rule under question here was adopted voluntarily by the member school, Centenary College, and not imposed upon it by NCAA. However, failure to adopt the rule eliminates the school from championship competition and television appearances.

NCAA governs intercollegiate athletics of its members in accordance with the provisions of its constitution, bylaws, official interpretations, memoranda, and other official rulings which it promulgates. These rulings directly affect not only its member institutions in all fifty States, but all student athletes attending those member institutions. NCAA establishes academic standards with regard to initial eligibility of student athletes at its member institutions, minimum grade point averages and a required number of hours necessary to maintain eligibility, academic standards relating to the eligibility of transfer students, as well as other criteria of a non-academic nature with regard to eligibility.

Without question, then, it readily is seen that NCAA has minimum contacts with this State. However, NCAA is an unincorporated association having members in all States and is a citizen of all States, including Louisiana, thereby precluding citizenship diversity as a basis for jurisdiction in any Federal Court. United States Steelworkers of America, AFL–CIO v. Bouligny, Inc., 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965).

Consequently, in order for this Court to have jurisdiction over this matter, under the Fourteenth Amendment of the Constitution and Title 42 U.S.C. § 1981 et seq., there must be State action involved.

The Fifth Circuit has had little trouble declaring ·that the Louisiana High School Athletic Association's actions are State action in the constitutional sense. Louisiana High School Athletic Association v. St. Augustine High School, 396 F.2d 224 (5th Cir., 1968); Mitchell v. The Louisiana High School Athletic Association, 430 F.2d 1155 (5th Cir., 1970). The same principle has been applied by other Courts. Oklahoma High School Athletic Association v. Bray, 321 F.2d 269 (10th Cir., 1963); Brenden v. Independent School District 742, 342 F. Supp. 1224 (D.Minn., 1972); Reed v. Nebraska School Activities Association, 341 F.Supp. 258 (D.Neb., 1972); Taylor v. Alabama High School Athletic Association, 336 F.Supp. 54 (M.D.Ala., 1972).

The Louisiana High School Athletic Association's activities (membership 85% public, 15% private) and its control and regulation of its members, as held by the Fifth Circuit, are remarkably similar to NCAA's activities here. We quote directly from the Fifth Circuit's ruling in Louisiana High School Athletic Association v. St. Augustine:

"I

"There can be no substantial doubt that conduct of the affairs of LHSAA is state action in the constitutional sense. The evidence is more than adequate to support the conclusion of the district court that the Association amounts to an agency and instrumentality of the State of Louisiana. Membership of the Association is relevant—85 per cent of the members are state public schools. The public school principals, who nominally are members, are state officers, state paid and state supervised, and together are the heads of all the white public high schools in Louisiana that participate in interscholastic athletics.

"Funds for support of the Association come partly from membership dues, largely from gate receipts from games between members, the great majority of which are held in state-owned and state-supplied facilities. The paid staff of LHSAA is covered in part by the Louisiana Teachers Retirement Act and staff members are legally defined as teachers.

"The Association exercises wide control over scheduling, participation in and conduct of athletic events. Its by-laws . . . require principals be responsible to it alone in matters pertaining to interscholastic athletic activities. It prepares and enforces eligibility rules. It limits the number of football and basketball games a public school may play in one season . . . . Contracts for games must be made on official LHSAA forms . . . . Game officials must be selected from the official LHSAA list . . . and paid a fee fixed by the Association . . . . Annually the Association sponsors a basketball tournament conducted in public facilities . . . . Participation in tournaments, post season games, and bowl games must receive Association approval . . ., and the financial report thereon must be submitted within 21 days . . . .

It has the power to keep schools from competing against other schools.

"The power of the Association reaches not only to the stadiums, the gynmasiums and the locker rooms but into the public classrooms, the public principals' offices and the public pocketbook. It exercises control over curricula—a coach must teach a designated minimum number of classes per week. Principals are required to submit certain reports to the Association. The Association has the power to investigate, discipline and punish member schools by fine and otherwise. If a public school principal does not comply with the mandate of the Association, or if a public school uses an athlete whose eligibility is questioned by the Association, or if the student body of a public school act improperly in connection with an athletic event, the school—a state agency—is subject to Association discipline.

"The state schools are deeply involved in fielding and promoting athletic teams with expenditure of tremendous time, energy and resources. The state (including in that term schools and school systems to varying extents at various places as arms of the state) provides and pays the coaches, pays some coaches overtime for their afterschool work, supplies, athletic equipment, at times makes cash grants for athletic purposes, carries insurance on players and facilities, supplies transportation to teams. The state finances, equips, trains and fields the teams. The Association assists, advises and aids in the effort, establishes standards and supervises and coordinates what the fielded teams do.

"The factual context is not of the state's declining to act in an area which is then taken over by a private instrumentality. The state has not withdrawn from supervision and coordination of interscholastic activities as the Association contends. Instead, as the district court pointed out, inter-

scholastic athletics is a program in which the state is actively and intensively involved, and 'for the state to devote so much time, energy, and other resources to interscholastic athletics and then to refer coordination of those activities to a separate body cannot obscure the real and pervasive involvement of the state in the total program.' [St. Augustine High School v. Louisiana High School Athletic Ass'n] 207 F.Supp. [767] at 773." At pp. 227 and 228 of 396 F.2d (footnotes omitted).

NCAA's sanctions, regulations, directives, and disciplinary action can be directed toward public universities in Louisiana associated with it. Thus, the public universities—State agencies—are subject to the Association's discipline and regulations. Although the college involved here is private, this is of no assistance to defendant because of the large number of public colleges and universities which are members. *St. Augustine High School, supra.*

Additionally, Article IV of the Bylaws (1972/73 NCAA Manual, page 47) prescribes academic requirements which must be met by student athletes in the member organizations. This Bylaw sets forth extensive academic requirements before an athlete is eligible to compete in certain events and also at member schools: it regulates transfers from one school to another; it sets forth the minimum amount of academic semester hours a student athlete must pursue in order to compete; minimum grade point averages which must be maintained are set forth; and also regulated are academic standards which entering students must meet in order to be eligible to compete (the bone of this controversy is the 1.6 Rule for admission purposes). Although "What is 'private' action and what is 'state' action is not always easy to determine. . . . Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state ac-

tion. . . . That is to say, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed. 2d 373 (1966).

Although NCAA is a nationwide association, it does control public schools which are State agencies to the extent that the high school athletic associations control their respective members at least insofar as regulations, sanctions, and discipline are concerned. Moreover, State funds are used by public schools to pay membership dues in this association.

■ Therefore, we must and do conclude that there definitely is State action here, in the constitutional sense, when NCAA regulates schools and universities at least half of which are public. In the only other decision on this particular point, although unreported, Judge Wollenberg of the Northern District of California is in agreement that such action is State action. Curtis v. NCAA, No. C–712088 ACW.

Alternatively, NCAA has requested that we certify this to be a controlling question of law, as to which reasonable legal minds may differ, in order that it may take an interlocutory appeal upon the jurisdictional question. It is our opinion that an immediate appeal from this order will not materially advance ultimate termination of this litigation. Hearing has been set for determination of whether the federal question involved is substantial or frivolous and this hearing is set for approximately one and one-half weeks hence, on April 4, 1973. After such hearing, a full record will have been developed on all questions, from which either side may appeal.

Consequently, the motion for summary judgment based upon jurisdictional issues, as considered at this time, is denied. The issue of whether there is a substantial federal question presented will be determined after evidence has been presented.