COLORADO SEMINARY (UNIVERSITY OF DENVER) et al., Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and Harry E. Troxell, Defendants.

Civ. A. No. 76–A–510.

United States District Court, D. Colorado.

July 16, 1976.

Victor Quinn, Edward J. Lemons, Gordon A. Martin, Jr., Boston, Mass., and Burton F. Brody, Denver, Colo., for plaintiffs.

Davis, Graham & Stubbs by Robert H. Harry and John C. Guadnola, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

Plaintiff Colorado Seminary (University of Denver) and several of its student-athletes appeared before the Court on May 14, 1976, seeking a temporary restraining order, preliminary and permanent injunctions, declaratory relief, and damages against defendants National Collegiate Athletic Association (NCAA) and its regional representative. The claims were asserted under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, with jurisdiction invoked pursuant to 28 U.S.C. § 1343(3) and (4). The relief sought included an injunction restraining defendants from imposing sanctions against the University for alleged violations of the NCAA constitution and implementing legislation and from forcing the University to declare several of its hockey players ineligible.

Following a hearing the Court granted the temporary restraining order and set the motion seeking a preliminary injunction for hearing on May 20, 1976. That hearing was subsequently continued until June 22 with the restraining order likewise extended on oral stipulation of counsel. In the interim defendants filed a motion to dismiss.

At the June 22 hearing the Court expressed its desire to treat the motion to dismiss as one for summary judgment pursuant to Rule 12, Fed.R.Civ.P., so that the evidence to be presented could be considered both in regard to the motion for preliminary injunction and the motion to dismiss. Counsel for plaintiffs and defendants concurred and plaintiffs subsequently filed their own motion for summary judgment. From the testimony presented, exhibits received, and memorandum submitted the Court makes the following findings of facts and conclusions of law.

## I.

■ Plaintiff Colorado Seminary, a corporation chartered pursuant to an Act of the Colorado Territorial Legislature, owns and operates the institution of higher education known as the University of Denver (D.U.). The remaining plaintiffs are student-athletes who have participated in the sport of ice hockey for D.U. during the past season and have for various reasons been declared ineligible at the insistence of the NCAA.[1]

The NCAA is a voluntary unincorporated association of approximately 830 members consisting of colleges and universities, conferences and associations and other educational institutions. Its active members are four-year colleges and universities located throughout the United States, of which approximately fifty percent are private institutions and fifty percent state or federally supported institutions. D.U. is a private institution and ·at all pertinent times has been a member of the NCAA. To provide a full appreciation of the impasse out of which this lawsuit arose it is necessary to set forth the policies and principles of the NCAA, their impact upon plaintiffs, and the history of the resulting dispute in some detail.

### A.

The NCAA constitution states in Article 2, Section 2 that a basic purpose of the Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between college athletics and professional sports. In addition to this general policy the constitution sets forth certain principles for the conduct of intercollegiate athletics. Included is the "Principle of Amateurism and Student Participation," Article 3, Section 1, which defines an amateur student-athlete as one who engages in a particular sport for the educational, physical, mental and social benefits he derives, and to whom participation in that sport is an avocation. The provision adds that a student-athlete shall not be eligible for participation in an intercollegiate sport if:

(1) He takes or has taken pay, or has accepted the promise of pay, *in any form*, for participation in that sport, or

.    .    .    .    .

(3) He has directly or indirectly used his athletic skill for pay *in any form* in that sport; however, a student-athlete may accept or have accepted scholarships or educational grants-in-aid *administered by his educational institution* which do not conflict with the governing legislation of this Association. (emphasis added).

Member institutions are obligated to apply and enforce NCAA legislation enacted in furtherance of these policies and principles. The enforcement program of the Association applies to an institution when it fails to fulfill this obligation. Article 2, Section 2, NCAA Constitution.

The legislation may take various forms, such as bylaws and executive regulations. Also, the NCAA Council, which establishes and directs the general policy of the Association in the interim between annual conventions, may in that interim make interpretations of the constitution and bylaws which are binding after their publication and circulation to the membership. In the interim between meetings of the NCAA Council the President, Secretary-Treasurer and Executive Director of the NCAA, the officers of the Association, may make similarly binding interpretations. The rele-

---

1. Several student-athletes who participated in the school's baseball program were initially parties to this action. However, because the season is now completed and the team was not selected for postseason competition these plaintiffs voluntarily dismissed the suit as to themselves. Defendants assert that the student-athletes on the hockey team who have now graduated should also be dismissed. While they may not be entitled to injunctive relief at this time defendants' suggestion ignores that damages are also sought for their having been forced off the hockey team during the past season at the insistence of defendant NCAA.

vance of this authority will be subsequently seen.

Prior to October 25, 1974, the "Official Interpretations" relevant to these proceedings were:

0.I.5. A student-athlete may have played ice hockey on a team in a foreign country prior to his matriculation at a member institution, provided that any student-athlete who has been a member of any ice hockey team in a foreign country shall be ineligible if he has received, directly or indirectly, from a hockey team any salary division or split of surplus, educational expenses, or has received payment for any expenses in excess of *actual and necessary* travel expenses on team trips, a reasonable allowance for one meal for each practice and home game and *actual and necessary* travel expenses to practice and home games. . . . (emphasis added).

0.I.6. Any student-athlete who has participated as a member of the Canadian Amateur Hockey Association's major junior A hockey classification shall not be eligible for intercollegiate hockey.

In 1973 a district court in Boston sustained a challenge to these interpretations as constituting unconstitutional discrimination based on alienage. *Buckton v. National Collegiate Athletic Association*, 366 F.Supp. 1152 (D.Mass.1973). In the course of that litigation the NCAA obtained information which, together with that court's decision, led it to seek further information from institutions which participated in ice hockey. It subsequently sent a memorandum in September of 1974 to the directors of athletics at the various schools informing them that all student-athletes competing in intercollegiate ice hockey during the 1974–75 academic year were to complete a new ice hockey questionnaire relating to eligibility, and that the school was to then declare each player eligible or ineligible.

Based on the information obtained from the questionnaires, and again in response to the *Buckton* opinion, the NCAA Council revised and clarified the official interpretations in an attempt to eliminate any discrimination either in favor of or against Canadian hockey players while maintaining fidelity to their own views of amateurism. Official interpretations 5 and 6 were rescinded effective October 26, 1974, and new interpretations were adopted including the following:

0.I.1. . . .

(b) The term "pay" specifically includes, but is not limited to, receipt directly or indirectly of any salary, gratuity or comparable compensation, division or split of surplus, educational expenses not permitted by governing legislation of this Association, and excessive or improper expenses, awards and benefits. *Expenses received from an outside amateur sports team or organization in excess of actual and necessary travel and meal expenses for practice and game competition shall be considered pay.* (emphasis added).

At the same time that the NCAA informed its ice hockey-playing institutions of the actions taken by the Council it notified them of a meeting of the Subcommittee on Eligibility Appeals to be held on November 10 and 11, 1974. Because it was then apparent that the institutions would be forced to declare many players ineligible and because of "the possible lack of clarity prior to these revisions concerning the circumstances under which educational expenses could be received by ice hockey players in Canada," Defendant's Exhibit A (Exhibit D to Affidavit of Warren Brown),[2] the NCAA further advised member institutions that the eligibility of student-athletes meeting certain conditions would be immediately restored. However, the schools would still have to first declare these students ineligible. While all other member institutions complied the University of Denver was not to be so easily persuaded to follow the NCAA "game plan," even if it were the "only game in town."

---

2. Other exhibits to the Affidavit of Warren Brown will be hereinafter cited only to Affidavit Exhibit Letter.

## B.

In response to the September, 1974 NCAA Memorandum the University of Denver like other hockey-playing institutions had provided the NCAA with the questionnaires executed by its various student-athletes. The information furnished revealed among other things that several of the D.U. hockey players had received room and board expenses from outside amateur teams and thus indicated to NCAA officials that these student-athletes were ineligible. However, unlike the other hockey-playing institutions D.U. refused to declare these students ineligible, instead unequivocally stating that each student-athlete was eligible.

The refusal was based upon the University's own interpretation of applicable NCAA legislation. This interpretation was derived in part from the opinion of the hockey coach, Murray Armstrong, who had previously served on several NCAA committees. Coach Armstrong believed that a hockey player was not a professional if he received an allowance from his team *in lieu of*, and not in excess of, an amount equal to his "actual and necessary" expenses for travel plus one meal in connection with each practice and game.

The University's Chancellor Maurice Mitchell, who considered Coach Armstrong "extremely familiar" with the situation, likewise determined that D.U. had done nothing wrong. Furthermore, it was his opinion that it would be "cynical" to declare these student-athletes ineligible because this seemed to say that the students were somehow lacking in character. He concluded that to sign the questionnaires declaring the students ineligible merely "to put them on the ice" would violate duties owed by the University to its students. Ultimately, it was his decision to declare the student-athletes eligible. Because of that determination there was no need to appeal for immediate reinstatement of the students' eligibility and thus D.U. sent no representatives to the November 10–11 meeting of the Subcommittee on Eligibility Appeals. The stage was set for the confrontation between Association and member.

## C.

On November 13, 1974, Warren S. Brown, the Assistant Executive Director of the NCAA, telephoned the late Hoyt Brawner, then athletic director of D.U., to inform him that the questionnaires submitted by D.U. contained information indicating that several student-athletes were ineligible under NCAA legislation although D.U. had declared them eligible. He reminded the athletic director that under then 0.I.20 if a student-athlete were ineligible the institution was obligated to apply the rules to the student-athlete and withhold him from all intercollegiate competition pending the results of any appeal. He further informed Brawner that it would be necessary for the school to declare in writing that the student-athletes were ineligible.

Several other conversations ensued between Mr. Brown and representatives of D.U. On November 27, 1974, Mr. Brown received a letter from the University stating that "it appear[ed]" that certain student-athletes were ineligible. In a subsequent phone conversation on December 5 Brown repeated the requirements for compliance, stated his opinion that the November 27 letter was not sufficient compliance, and informed Brawner that failure to apply the rules would subject the member institution to regular enforcement procedures and possible disciplinary action.

After conferring again with Chancellor Mitchell the athletic director returned Brown's phone call and informed him that the Chancellor had determined that the University of Denver would continue to play the student-athletes on its hockey team and that "if anybody is going to declare the students ineligible, it will have to be the NCAA. The University of Denver will not declare the student-athletes ineligible." [3] Defendants' Exhibit A (Affidavit of Warren Brown), page 7.

---

**3.** This of course ignored that the NCAA does not act directly against the student-athletes but rather imposes sanctions against member institutions which fail to apply NCAA legislation to its students.

The matter was then referred to the NCAA officers who in a conference call on December 10, 1974, concluded as follows:

Agreed that the University of Denver must declare several members of its ice hockey team ineligible and not permit them to compete before the institution can appeal for restoration of eligibility under NCAA Constitution 4–2–(a), 0.I.20; further, the written statement submitted to date by the University is not a statement that the Constitution has been applied; finally, the matter shall be referred to the Committee on Infractions inasmuch as the institution continues to permit the affected players to participate. Defendants' Exhibit A, page 8.

As previously noted, interpretations by the NCAA officers during the interim between NCAA Council meetings are binding on member institutions. The University was informed of the decision in a letter dated December 13, 1974.

After a preliminary investigation the Committee on Infractions authorized an "Official Inquiry," utilized for serious violations, in January of 1975. However, because of the backlog of cases before the NCAA investigative staff, a letter of Official Inquiry was not sent to the University until some ten months later. The Committee then informed D.U. there would be a hearing on December 17, 1975, and by letter twice requested the presence of Chancellor Mitchell and Acting Director of Athletics David Fletcher at that hearing. In an attachment to a November 14, 1975 letter the Committee also informed the Chancellor of the allegations concerning his own actions, including certifying the players eligible once again in 1975. Exhibit J.

Neither the Chancellor nor Mr. Fletcher appeared at the December hearing. Chancellor Mitchell testified that he treated the letters as merely requests and did not understand that his attendance was of importance. Since he had prior commitments he requested that other University representatives attend who could "shed light" on the issues, but apparently not David Fletcher who had since been replaced.

On December 29, 1975, the Committee on Infractions forwarded to Chancellor Mitchell a copy of its Confidential Report, setting forth its findings and proposed penalties. The proposed penalties included indefinite probation until such time as the University complied with NCAA legislation and certified the hockey players ineligible, to be reduced at that time to two years probation. The probation would include a sanction preventing any D.U. athletic team from participating in postseason tournaments, and from participating in any national television series or programs administered or controlled by the Association. The Committee further noted certain executive regulations appearing to require the return of a trophy and money received in the 1973 National Collegiate Hockey Championship because plaintiffs Carefoot and Miller had competed in the championship while ineligible.

The primary factors upon which the Committee premised its actions included the fact that the University had knowingly and willfully ignored the notification to it of the interpretations of NCAA legislation, had continued to allow the ineligible student-athletes to compete for nearly two years, and had again certified them as eligible in 1975. The report also recommended a private reprimand based on a "failure to cooperate" in that Chancellor Mitchell and Mr. Fletcher had not appeared before the Committee at the time of the institution's hearing despite the "repeated requests" of the Committee that they do so. The University timely filed an appeal to the NCAA Council from the Committee's Confidential Report.

While the University's appeal from the Confidential Report was awaiting hearing the newly appointed Athletic Director, Ronald J. Oyer, inquired in the course of a conversation with an NCAA staff member as to the reason for the severity of the punishment accorded D.U. He was informed that by continuing to play the stu-

dent-athletes the University was regarded as being "defiant." D.U. personnel were also subsequently advised that were the University to declare the student-athletes ineligible the Subcommittee on Eligibility Appeals would apply the same standards to them as it had applied in the earlier appeals in November of 1974. Oyer then persuaded Chancellor Mitchell to agree to the declaration of ineligibility, even though Mitchell still considered it a cynical act. By letter dated March 2, 1976, the University declared the hockey players ineligible, withdrew them from intercollegiate competition, and appealed for immediate restoration of their eligibility.

The Subcommittee on Eligibility Appeals met on March 5, 1976. Contrary to the expectations of D.U. the eligibility of student-athletes such as plaintiffs Falcone and Glanville, who had received compensation for room and board expenses *while not in school*, was not restored. It was apparently the first time the distinction based on receipt of aid while not enrolled in school had been pointed out to D.U., although it is uncontroverted that the same distinction had been utilized in considering the earlier appeals for reinstatement of eligibility by other institutions on behalf of their student-athletes. *See, Jones v. National Collegiate Athletic Association*, 392 F.Supp. 295 (D.Mass.1975).

The Subcommittee directed the University to continue to apply NCAA legislation to the eligibility of these young men until the conclusion of the 1976–77 intercollegiate ice hockey season, including postseason competition. It further directed the University to charge the students with the loss of one year of eligibility.

> Simply stated, each young man received these benefits for an entire hockey season and, therefore, is charged with the corresponding loss of an entire intercollegiate hockey season. Exhibit R.

The ruling of the Subcommittee on Eligibility Appeals was likewise timely appealed to the NCAA Council.

At its meeting on April 26, 1976, the NCAA Council heard the appeal from the findings and proposed penalties of the Committee on Infractions and the next day heard the appeal for immediate restoration of the eligibility of D.U.'s student-athletes. On May 3, 1976, the NCAA wrote the University to inform it that the appeals for immediate restoration of eligibility had been denied. However, because of additional information submitted, the University was required to apply the NCAA legislation to plaintiff Glanville for just five games. Since he had missed the last four games of the previous season due to his ineligibility he would miss only one contest the next season. The Council also denied the appeal on behalf of plaintiff Falcone, but did approve the University's request that he be allowed to participate after the school has completed all but four games of the 1976–77 season since he had also been withheld from the completion of the previous season.

On May 10, 1976, the Council informed D.U. of its decision with respect to the appeal from the Confidential Report. The decision was made public the next day. The NCAA placed D.U.'s hockey team on a two year probation, preventing it from competing in postseason tournaments at the end of the 1977 and 1978 seasons and from appearing on any television program administered or controlled by the NCAA during those seasons. All other athletic teams were placed on a similar probation for one year. Having failed to convince the NCAA that the University's own ideas of the principles of amateurism should prevail, and believing the procedures followed and penalties imposed to be unjust if not unconstitutional, D.U. and the student-athletes commenced this lawsuit.

## II.

Plaintiffs claim violations by the NCAA of their constitutional rights to procedural and substantive due process and to equal protection. It is necessary to separately consider the constitutional claims in

894

relation to the separate interests of the University and the student-athletes.[4]

## A.

### Due Process

A litany of procedural defects are asserted including challenges to the impartiality of the Committee on Infractions and its Chairman, Professor Reynolds; the lack of standards on which to base a determination that an official inquiry was necessitated and on which to base the imposition of serious penalties; the failure to provide the student-athletes the right to counsel at the eligibility appeals hearing conducted by telephonic conference; the refusal to allow the University to make a record of proceedings before the Committee on Infractions; and the alleged failure to have properly promulgated NCAA legislation so as to give notice of what constituted violations of that legislation.

■ Before considering the asserted defects it is necessary to determine the scope of protection provided by the Constitution through the due process clause of the fourteenth amendment. That amendment is not an absolute panacea for all harms which may be incurred but rather provides that no

State shall deprive any person of "life, liberty, or property" without due process of law. It must therefore first be determined whether the interests of plaintiffs affected by the actions of the NCAA fall within the concepts of "property" or "liberty" so as to invoke due process protections.

The student-athlete plaintiffs assert that they have been unconstitutionally deprived of the right to compete in intercollegiate athletics. The Tenth Circuit in *Oklahoma High School Athletic Association v. Bray*, 321 F.2d 269 (10th Cir. 1963) addressed a claim by a high school student-athlete that a high school athletic association had wrongfully deprived him of the right to play interscholastic football. The essence of the complaint was that playing competitive football was an integral part of the educational system in the secondary schools. The court held that the complaint "had not the slightest overtone of a federal question." *Id.* at 273.

Such complaints are not within federal cognizance, are not subject to review in federal court, and, indeed, are not subject to review in the state courts in Oklahoma. Had this case not been voluntarily dismissed by plaintiff it would have been

---

4. Other preliminary considerations include whether the University is a proper plaintiff and the Association a proper defendant under 42 U.S.C. § 1983. Although not discussed by the parties it does appear that the University is a "citizen . . . or other person" entitled to bring an action under § 1983, *Grosjean v. American Press Company*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Safeguard Mutual Insurance Company v. Miller*, 472 F.2d 732 (3rd Cir. 1973); *see, Howard University v. National Collegiate Athletic Association*, 367 F.Supp. 926 (D.D.C.1973), aff'd, 166 U.S.App. D.C. 260, 510 F.2d 213 (1975), and that the Association is a "person" subject to suit under the statute. *See, Oklahoma High School Athletic Association v. Bray*, 321 F.2d 269 (10th Cir. 1963); *Weathers v. West Yuma School District R–J–1*, 387 F.Supp. 552 (D.Colo.1974), aff'd, 530 F.2d 1335 (10th Cir. 1976), and cases cited below.

A more difficult question is whether the actions of the NCAA were "under color of state law." While the courts have fairly consistently found sufficient state involvement in NCAA actions, *Howard University v. National Collegiate Athletic Association*, 166 U.S.App.D.C. 260,

510 F.2d 213 (1975), *affirming*, 367 F.Supp. 926 (D.D.C.1973); *Parish v. National Collegiate Athletic Association*, 506 F.2d 1028 (5th Cir. 1975), *affirming*, 361 F.Supp. 1214 (W.D.La. 1973); *Associated Students, Inc., etc. v. National Collegiate Athletic Association*, 493 F.2d 1251 (9th Cir. 1974); *Jones v. National Collegiate Athletic Association*, 392 F.Supp. 295 (D.Mass.1975); *Buckton v. National Collegiate Athletic Association*, 366 F.Supp. 1152 (D.Mass.1973); *contra, McDonald v. National Collegiate Athletic Association*, 370 F.Supp. 625 (C.D.Cal.1974); *see, Samara v. National Collegiate Athletic Association*, 1973 Trade Case, Par. 74,536 (E.D.Va.1973), recent Supreme Court decisions leave the issue not free from doubt. *See, Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *but cf., Howard v. National Collegiate Athletic Association, supra*, 510 F.2d at 219 n. 10. However, the Court is persuaded by the weight of precedent that there is sufficient state entanglement to invoke the protections of the fourteenth amendment.

the duty of the trial court, upon the present record, to have dismissed it for lack of a federal question. *Id.* (footnote omitted)

The Supreme Court subsequently recognized a student's entitlement to a public education as a property interest which is constitutionally protected in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). However, in a recent case before the Tenth Circuit again challenging a ban on interscholastic high school competition reliance on the Supreme Court's decision in *Goss* proved unpersuasive:

> [I]t is necessary to note that in framing the property interest the Court in *Goss* speaks in terms of the "educational process." . . . The educational process is a broad and comprehensive concept with a variable and indefinite meaning. It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement. We do not read *Goss* to establish a property interest subject to constitutional protection in each of these separate components. *Albach v. Odle*, 531 F.2d 983, 985 (10th Cir. 1976).

The Circuit Court reaffirmed that participation in interscholastic athletics is not a constitutionally protected civil right.

Plaintiffs seek to avoid the precedent in this Circuit by arguing that the relationship between a college athlete and his institution includes dimensions not present in the relationship between a public high school and its athletes, such as the financial aid provided college athletes in exchange for their athletic service.

■ While the Court might agree that the deprivation of a previously granted scholarship would invoke the protections of procedural due process it is of no benefit to the student-athletes in this case. Those who have graduated have not been requested to return any aid received while attending the University. As to plaintiffs Falcone and Glanville, who have yet to complete their studies, Chancellor Mitchell testified in response to a question from the Court that the University would not cancel these students' scholarships even though they have been declared ineligible for portions of next season.[5]

■ Plaintiffs also stress that the college athletic forum is a vital training ground for professional athletic careers. However, the Tenth Circuit rejected this same claimed need for a forum as a liberty interest in *Oklahoma High School Association v. Bray, supra.* We perceive no constitutional distinction between the loss of a forum for obtaining a contract for a college scholarship and a similar loss of a forum for obtaining a professional contract. Thus, while plaintiffs' characterization of the distinctive importance of collegiate athletics as a forum may be a sadly accurate reflection of the true significance of today's amateur athletic competition, the interest in future professional careers must nevertheless be considered speculative and not of constitutional dimensions. *Parish v. National Collegiate Athletic Association*, 506 F.2d 1028, 1034 n. 17 (5th Cir. 1975). Nor do the

---

5. There is a somewhat stronger argument that can be made on behalf of the student-athletes which supports the contention that athletic competition by students on scholarships is constitutionally distinguishable from competition by students, either high school or college, not on scholarships. It is that the contracted for property interest is not just the scholarship funds received in exchange for the athletes' services. The contractual interest includes the expectation that the student will be allowed to participate in intercollegiate competition, the only contingency being that he be good enough to make the team and that he avoid injury. Thus, the services offered is what is also sought—the playing of collegiate sports. The "liberty interest" in a forum, next discussed, becomes a property interest provided by contract in a forum. And the claimed property interest in intercollegiate athletics has the added dimension of a contract to play intercollegiate athletics. However, the Court is not persuaded that the interest is the equivalent of a legal entitlement necessary to establish a constitutionally protected interest. The athlete on scholarship has no more "right" to play than the athlete who "walks on." The interest is therefore too speculative to establish a constitutionally protected right.

interests in postseason competition or appearances on television seem to be of a constitutionally greater magnitude. *Id.* The Court is therefore constrained by the precedent in this Circuit to conclude that the plaintiff student-athletes have no constitutionally protected property or liberty interest in participation in intercollegiate athletics, postseason competition, or appearances on television.[6]

█ No reasons have been presented as to why the interests of the University would require a different result. Testimony was elicited to the effect that there has been a "stigma" on the University which has affected the school's recruitment in several sports. While the Court does not discount the detrimental effect adverse publicity may have had, the Supreme Court has recently concluded that the "stigma" resulting from alleged defamation by the government does not violate any liberty or property right in reputation alone. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). To the extent the detriment is a result of the sanctions imposed and not the adverse publicity the previously discussed decisions of the Tenth Circuit would seem to likewise preclude a finding of a violation of any constitutionally protected liberty interest of the University in being able to compete in postseason competition, appear on television, or recruit the best athletes. *See, Howard University v. National Collegiate Athletic Association,* 166 U.S.App.D.C. 260, 510 F.2d 213 (1975).

█ Because it is our conclusion that plaintiffs have asserted no interests within the protection of procedural due process the Court is likewise foreclosed from consideration of the merits of the claimed violation of substantive due process rights. *Weathers v. West Yuma County School District R-J-1,* 530 F.2d 1335 (10th Cir. 1976). In sum, there can be no finding of a violation of any constitutionally protected right to procedural or substantive due process resulting from the penalties imposed by the

NCAA or from their insistence that D.U. declare certain student-athletes ineligible.

█ There is a separate challenge to the actions of the NCAA, however, which presents a substantial, and in the opinion of the Court, valid constitutional due process claim. The NCAA is seeking the return of money and a trophy received by D.U. for its participation in the 1973 National Collegiate Ice Hockey Championship, based on Executive Regulations 2–2–(e) and 2–3–(e).

The Committee on Infractions stated in its report to the NCAA Council, Exhibit X, that the regulations "in effect" provide that when an ineligible student-athlete participates in an NCAA championship, all except 10 percent of the university's net receipts from such competition must be returned to the Association, along with any award received, and that the team's performance and record shall be deleted and its place in the final standings vacated. Though entitled to great weight, we cannot accept the Committee's interpretation of the regulations.

Section 2–2–(e) provides that when an ineligible student-athlete participates in an NCAA championship ninety percent of the institution's share of the net receipts from such competition in excess of the regular expense reimbursement, if previously distributed to the school, must be returned to the Association *provided* one of the following two conditions are met: 1) the student or the institution "knew or had reason to know of his ineligibility," or 2) "a penalty has been imposed or action taken as set forth in Section 7–(a)–(11) or Section 10 of the NCAA enforcement program."

Section 10 refers to penalties arising from competition in accordance with the terms of a court restraining order or injunction. Actions subsequent to this Court's temporary restraining order are not here in issue, making this section inapplicable. Section 7–(a)–11 sets forth the various penalties which the Committee on Infractions *may* impose, including forfeiture of a

**6.** Our analysis is no different whether we base our holding on the lack of subject-matter jurisdiction or the failure to state a claim. *Hospital Building Co. v. Trustees of Rex Hospital,* —— U.S. ——, ——, 96 S.Ct. 1848, 48 L.Ed.2d 338, n. 1 (1976).

school's share of net proceeds. While the Committee on Infractions did point out the executive regulations here in question, it characterized its statements as a notification only, and expressly stated that the notification was *not* a penalty proposed by the Committee. Similarly, the NCAA Council, while listing the certification and participation of the two Freshmen in the 1973 championship as a violation, did not include the forfeiture of receipts from that tournament as a "penalty or action taken." Since this section then could likewise not have been the basis of forfeiture, there must be a finding that the student-athletes or the institution knew or had reason to know of the ineligibility of the hockey players. There is no indication in the record that the NCAA has ever made such a determination. The Association thus cannot sanction the University for its refusal to return the funds, at least not prior to a hearing on the issue of knowledge of ineligibility.

Executive Regulation 2–3–(e) provides for the return of the trophy, deletion of team performance and records, and vacation of final standings, again upon meeting either of two conditions. The second alternative like that in Section 2–2–(e) requires forfeiture where a penalty has been imposed pursuant to Section 10 or Section 7–(a)–11 of the Enforcement Procedures. Since as previously observed no such penalties were in fact imposed this cannot be the premise for the NCAA's attempted recovery of the trophy. However, unlike Section 2–2–(e) there is no requirement in the first alternative that the student-athlete or the institution must have known or had reason to know of the ineligibility. Rather, the regulation states that the sanctions may be imposed merely from a student-athlete being declared ineligible subsequent to a tournament. Nevertheless, it is possible that in the interests of fairness and consistency the NCAA, if confronted with the issue, might well interpret the regulation as presenting the same conditions as Section 2–2–(e). We also note that D.U. is presently appealing the attempted recovery of the trophy and funds within the Association. The Court

will therefore enjoin the NCAA from taking any actions against D.U. for its refusal to forfeit the trophy and receipts from the 1973 championship until the Association has had the opportunity to consider the issues raised herein and has provided the University a hearing on the issue of whether the student-athletes or the school knew or had reason to know of the ineligibility of the two hockey players.

### B.

#### Equal Protection

Plaintiffs present essentially two claims of violations of their rights to equal protection. The first, on behalf of the student-athletes, is addressed to the official interpretations, the second, on behalf of the University itself, challenges the penalties imposed.

1) It is first asserted that the prohibition on receipt of compensation for expenses other than travel and one meal from an outside source discriminates between various classes of student-athletes— Canadian and American, poor and rich, rural and city. The gist of the claims of discrimination against these shifting and sometime vague classes is that poor rural students, most commonly Canadian, must move to cities where amateur hockey is being played to be able to participate and, to be able to live, must accept compensation from the teams for such expenses as room and board.

It is now well established that the right to an education, though important, is not so fundamental as to require strict scrutiny of classifications allegedly affecting that right. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). However, classifications based on alienage are inherently suspect and thus subject to strict scrutiny. *E. g., Buckton v. National Collegiate Athletic Ass'n, supra*. Plaintiffs assert that the present official interpretations, though not explicitly based on alienage, nevertheless require strict scrutiny. We cannot agree.

The same court which struck down the previous official interpretations in *Buckton*

while utilizing strict scrutiny has subsequently found, and we believe correctly, that the present classifications in the interpretations apply to all hockey players of all nationalities and are not based on alienage or any other basis requiring strict scrutiny. *Jones v. National Collegiate Athletic Association*, 392 F.Supp. 295, 298 (D.Mass.1975). Indeed, plaintiff Falcone is an American whose eligibility was lost for having accepted compensation for room and board expenses from an American amateur team.

Accordingly, the plaintiff[s] [are] entitled to have the N.C.A.A.'s eligibility regulations invalidated only if they bear no rational relationship to that organization's legitimate objectives. *Id.*

The objectives of the NCAA have been previously stated. They include maintaining intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body. In furtherance of these objectives Article 3, Section 1 of the NCAA constitution requires in substance that any aid received with minor exceptions be administered by the student-athlete's educational institution. This was spelled out in the previous 0.I.5 and is made clear in the present 0.I.1.

There is some merit to the argument that those student-athletes who received aid from an outside team while in school were in a substantially similar position to those receiving aid from their school for the same expenses. But this is not to say that the restrictions have no "fair and substantial relation to the object of the legislation." *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). Although explanations for the restrictions have not been presented, an obvious reason would be to avoid the practical difficulties of monitoring and controlling aid received from a nonmember, over which the Association could exercise no authority. It might also be pointed out that it was these student-athletes the NCAA determined to immediately reinstate.

The situation of those student-athletes receiving aid from outside sources while not in school is entirely different. The court in *Jones v. National Collegiate Athletic Association, supra,* observed that play during the periods while not in school cannot be considered as coincidental to or in conjunction with obtaining an education. That court concluded:

The challenged regulations would make ineligible any athlete, American or Canadian, who while not attending school, was given financial assistance to play hockey. Accordingly, a decision to restore plaintiff's eligibility under these circumstances would put him on a superior, and not merely equal, footing with other student-athletes. This the court cannot do. *Jones v. National Collegiate Athletic Association, supra,* at 301.

We concur in the holding of the court in *Jones* that the present regulations do not unconstitutionally discriminate against those in any of the classes suggested by plaintiffs, particularly not against those plaintiffs receiving compensation for room and board while not in school.

■ The Court is not oblivious to the less advantageous position in which a student-athlete without means may be placed by the effect of the NCAA regulations. But neither the Equal Protection Clause of the Fourteenth Amendment, nor the counterpart equal protection requirement embodied in the Fifth Amendment, guarantees "absolute equality or precisely equal advantages." . . . *United States v. MacCollom,* —— U.S. ——, ——, 96 S.Ct. 2086, 2091, 48 L.Ed.2d 666 (1976).

This Court cannot use the Constitution as a vehicle to alleviate the consequences of differences in economic circumstances that exist wholly apart from any NCAA action. *See, Griffin v. Illinois,* 351 U.S. 12, 34, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (Harlan, J., dissenting).

■ 2) The final constitutional challenge is directed to the penalty imposed upon D.U. by the NCAA. In brief, plaintiffs assert that the imposition of sanctions on the University's athletic teams not in-

volved in the dispute irrationally discriminates against D.U. in that other schools such as Michigan State and Minnesota, which have committed arguably more serious violations, have had penalties imposed only on the teams involved in those violations.

Plaintiffs' argument ignores a vital distinction between the University's case and that of the other mentioned schools. It is that the willful violation of NCAA legislation in D.U.'s case was not merely at the behest of a coach or administrator connected with a particular sport. It was the act of the highest executive official of the University of Denver. Nor are we persuaded that the act was a product of a misunderstanding rather than one of defiance. While the University may have justifiably considered the opinion of Warren Brown to be merely a personal point of view, any doubt as to the official position of the NCAA was removed when D.U. was notified in writing on December 13, 1974, that the Association's officers had concluded the information previously provided indicated that the student-athletes were ineligible. In the name of principle Chancellor Mitchell chose to ignore the notification and continued the participation of the ineligible hockey players in intercollegiate competition for nearly two more years. The penalty imposed was consistent with the treatment of three other schools in similar circumstances. Regardless of the propriety of the penalty in view of certain arguably extenuating circumstances, to be discussed, we cannot say that the penalties imposed unconstitutionally discriminate against the University of Denver.

It should be pointed out that each school is sanctioned on the basis of the particular circumstances involved in each case, much like actions taken in the areas of criminal enforcement and sentencing. Like those areas, this seems one particularly ill suited for intermeddling upon review. Absent a claim of discrimination based on an arbitrary and recognizable classification such as race, religion or national origin, the Court will not intervene. *Cf. North Carolina v.*

*Pearce,* 395 U.S. 711, 722–23, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). In sum, harsh treatment based on open defiance by the University's highest official, while undoubtedly seeming unfair to many, is not unconstitutionally discriminatory merely because it differs from the treatment of other schools in differing circumstances.

### III.

This Court is one of expressly limited jurisdiction whose statutory duties do not include sitting as a final arbiter of disputes between an association and its membership. A disturbing aspect of this litigation is the attempt to rely upon the federal judiciary to resolve essentially private disputes because of the refusal of the Association and member institution to deal with each other on a reasoning and where necessary compromising basis. Several unfortunate consequences have resulted. For example, it seems to have been virtually ignored that the continuing defiance by D.U. of NCAA authority for nearly two years was at least partially attributable to the lack of administrative continuity within D.U.'s athletic department caused by the untimely death of Athletic Director Hoyt Brawner. The delay of ten months between the decision to bring an official inquiry and actual notification to the University with subsequent findings and proposed penalties delayed receipt by the new Athletic Director Ronald Oyer of the reason for the harsh treatment. Earlier notice might have led Mr. Oyer to seek earlier compliance than he did and thus would have lessened the period of continued defiance. Earlier explanation of the distinction between receipt of aid while in school and not in school might have had a similar effect.

It should also be noted that the NCAA's insistence on the continued ineligibility of plaintiff Falcone is apparently based on the former regulation 0.I.5 which specifically prohibited such compensation, but specifically applied only to student-athletes playing on *foreign* teams. Falcone is an American who received compensation from an

American amateur team. It might be argued that the restrictions were meant to be even more stringent in the case of American student-athletes, Exhibit X, page 3, but this was far from clear.

Most importantly, because of the refusal of Association and member institution to cooperate student-athletes in all sports must suffer the consequences. We cannot constitutionalize amateur sports to protect their interests.[7] The result may well be to develop new levels of cynicism in young students who are so often the pawns in the games of power between associations, and associations and member institutions. But if nothing else, this case may well demonstrate that defiance in the name of principle can prove to be inflexibility disguised as a virtue. It is

ORDERED that plaintiffs' motion for a preliminary injunction should be, and the same hereby is denied, except that the NCAA shall not take any actions against the University of Denver based on its refusal to forfeit the trophy and receipts from the 1973 National Collegiate Hockey Championship until the Association has considered the interpretation of the Executive Regulations discussed herein and has provided the University a hearing on the issue of whether the student-athletes or the school knew or had reason to know of the ineligibility of two hockey players who participated in the 1973 tournament. It is further

ORDERED that plaintiffs' motion for summary judgment should be and the same hereby is denied with the foregoing exception, and that defendants' motion for summary judgment should be and the same hereby is granted with the same exception.

---

7. The interests of others concerned with this dispute have also not been mentioned. Students and fans who have supported the University's athletic teams will now be deprived of the possible memories of team triumphs and championships.

How many can remember the players in 7 out of the last 9 NCAA national championship basketball tournaments? But, no can really forget U.C.L.A. *McDonald v. National Collegiate Athletic Association*, 370 F.Supp. 625, 632 n. 10 (C.D.Cal.1974).